HUNTSMAN PACKAGING CORP. and Pierson Industries Inc., Plaintiffs,

v.

KERRY PACKAGING CORP., Barnett Bank of Central Florida, N.A., Polystar Industries, Inc., Robert Smith, and John Does 1 through 5, Defendants.

No. 95–699–CIV–ORL–18B.

United States District Court, M.D. Florida, Orlando Division.

Feb. 3, 1998.

Richard E. Whitaker, Bogin, Munns &
Munns, Orlando, FL, Russell S. Walker, Reid

W. Lambert, Woodbury & Kesler, P.C., Salt Lake City, UT, for plaintiffs.

Robert Smith, Boca Raton, FL, pro se.

Ralph V. Hadley, III, Swann, Hadley & Alvarez, P.A., Winter Park, FL, for Polystar Industries, Inc., defendant.

## ORDER

G. KENDALL SHARP, District Judge.

In this case, plaintiffs Huntsman Packaging Corp. (Huntsman) and Pierson Industries, Inc. (Pierson) sued defendants Kerry Packaging Corp. (Kerry), Barnett Bank of Central Florida, N.A., (Barnett), Polystar Industries, Inc. (Polystar), Robert Smith (Smith)[1], and certain unknown defendants to recover money allegedly owed them for materials furnished to Kerry on credit terms. Plaintiffs stated their claims in a seven-count complaint. Counts I and II are by Huntsman against Kerry for collection on a promissory note and breach of an open-account contract, respectively. Count III is by Pierson against Kerry for breach of their open-account contract. Counts IV, V, and VII assert that defendants conspired to, and did in fact, execute a fraudulent transfer of Kerry's assets for less than reasonably equivalent value, in an effort to defraud Huntsman and Pierson. Finally, Count VI contains a claim against Barnett, Polystar, Smith, and the Doe defendants for unjust enrichment. On October 23, 1995, the clerk of court made an entry of default against Kerry and Smith on plaintiffs' motion. The case was later tried before the court, without a jury, on January 12–13, 1998. On January 13, 1998, the court entered a default judgment against Kerry in the amount of $538,009.06, plus applicable interest, in accordance with the clerk's entry of same. Now, in accordance with Rule 52(a) of the Federal Rules of Civil Procedure, the court issues its findings of fact and conclusions of law on the remaining claims.[2]

### I. Findings of Fact

Prior to March 15, 1995, Kerry operated a business producing plastic packaging products in Longwood, Florida. During the times relevant to this lawsuit, Kerry was owned approximately 54 percent by Ralph Bender (Bender), 36 percent by Smith and five percent each by Peter Senecal and Allen Lemberger, two associates of Bender. Bender and his associates took no role in management. Smith was the President of Kerry and exercised complete control over Kerry's operations, including the management and control of Kerry's financial statements.

Huntsman and Pierson each supplied raw materials to Kerry on open account. In October of 1994, Kerry owed Huntsman $147,826.84 on account, which Huntsman then secured by way of a promissory note. Thereafter, Huntsman continued to sell raw materials to Kerry on open account. At the time of trial, Kerry's debt to Huntsman on open account was $87,371.25, and Kerry's debt to Pierson on open account was $171,759.65.

The total obligation to Huntsman and Pierson, with interest accrued through January 1, 1998 at the appropriate legal or contractual rates, was as follows

| | |
|---|---|
| Huntsman Note | $147,826.84 |
| Interest | 57,180.64 |
| Huntsman Open Account | 87,371.25 |
| Interest | 22,716.54 |
| Pierson Open Account | 171,759.65 |
| Interest | 49,559.82 |
| TOTAL | $536,414.74 |

Kerry defaulted on its obligation to make payments to both Huntsman and Pierson.

During 1993 and the early months of 1994, Kerry lost a substantial amount of money, primarily due to sales it made to a major customer at a price unwittingly lower than Kerry's costs of production. In 1994, Kerry engaged an accounting firm to review its business. On the firm's advice, Kerry ulti-

---

**1.** Smith represented himself throughout the instant proceedings, and specifically declined the court's invitation to make an opening statement or present evidence of any type on his own behalf.

**2.** Kerry was named as the sole defendant in Counts I, II, and III. Inasmuch as default judgment has been entered against Kerry, the court omits any treatment of those counts. As such, this order resolves only Counts IV through VII.

mately terminated its relationship with that customer on the firm's advice.

At about that same time, Kerry hired Waynne MacDonald (MacDonald) as part of its management team. Although it is unclear whether MacDonald was ever officially given the title, MacDonald functioned in virtually every way as the chief operating officer of Kerry, and third parties dealing with Kerry, including Barnett and plaintiffs, uniformly believed MacDonald to be Kerry's chief operating officer.

Throughout the time relevant to this lawsuit, Kerry was obligated to Barnett on three commercial loans, including two term notes and a line of credit. The first note was a revolving line of credit in the amount of $750,000.00, which was administered through a "lock-box" arrangement with Barnett. Under the terms of the agreement, Kerry's revenues were collected in a "cash collateral" account at Barnett and used to pay down the principal on the line of credit. To obtain working capital, Kerry was able to draw on the line of credit according to a formula as follows: 75 percent of accounts receivable under 90 days old plus 40 percent of eligible inventory not to exceed $100,000.00, less the outstanding principal balance of the loan. On March 15, 1995, the principal balance of this first loan was $182,445.04.

The second loan was a term note dated March 1, 1991, in the principal amount of $40,000.00. Kerry was current in making its payments on this loan as of March 1995, and the outstanding principal balance on the loan was $6,572.50 on March 15, 1995.

The third loan was a term note dated September 21, 1990, in the principal amount of $1,430,000.00. This loan was referred to as the "equipment loan." As of January 1, 1995, Kerry was current in its payments on the equipment loan. Kerry made interest payments on the note in January and February of 1995, but did not make timely principal payments in January and February 1995. On March 15, 1995, the outstanding principal balance on the equipment loan was $598,391.18.

In February and March of 1995, Kerry was a troubled business but was still a going concern. Its operating margins were consistent with the industry norm, and it was slowly working out of its financial difficulties under the direction of MacDonald. While some witnesses testified that Kerry was about to "go dark," the court finds that no credible evidence substantiated that assertion to a point where the court could conclude that Kerry was not a going concern.

On March 16, 1995, Kerry's accounts receivable were $484,034.94, of which all but $21,379.47 were less than 90 days old. Prior to March 16, 1995, Kerry had assigned $38,585.89 of these receivables to Polystar. Therefore the total eligible accounts receivable on Kerry's books was $424,069.58.

The only evidence as to the value of inventory on March 15, 1995 was the testimony of MacDonald and Smith who testified that it would have been similar to that reflected on the February 28, 1995 balance sheet. That amount was $309,478.36. On February 28, 1995, Kerry submitted a Borrowing Report to Barnett identifying "certified" eligible inventory of $93,261.38.

While some testimony indicated that Kerry had exhausted its line of credit in February of 1995, the court finds to the contrary. The Borrowing Report demonstrates that Kerry drew down $68,000.00 on February 21, 1995, $100,500.00 on February 24, 1995, and $55,000.00 on February 28, 1995. Based upon these figures, on March 15, 1995, Kerry would have been entitled to draw an additional $172,911.70 on its line of credit under the formula prescribed by its loan agreements.[3]

Further, trial testimony revealed several alternatives that Kerry had available to address its financial difficulties including a plan discussed and preliminarily approved by Barnett to sell one of its two printing presses, apply the proceeds to pay down the equipment loan, and exchange other equipment to

---

3. The total amount available would be calculated as follows:

| | |
|---|---|
| 75% of eligible accounts receivable | $318,052.19 |
| 40% of eligible inventory | $ 37,304.55 |
| Less Note 1 principal balance | (182,445.04) |
| Total available | $172,911.70 |

make Kerry more profitable. Kerry did not pursue this or any other available option because it elected to sell its assets to Polystar as further described below.

In 1994, Bender and Smith began to solicit offers for the purchase of their shares in Kerry. In August of 1994, Greg Rosshandler (Rosshandler) executed an agreement to purchase the shares of Smith, Bender, and Bender's associates for combined consideration of $525,000.00. The offer was ultimately rescinded when Rosshandler developed concerns about working with Smith.

In approximately December of 1994, Hershey Friedman (Friedman), the owner of a group of companies referred to generally herein as "Polystar," became interested in purchasing Kerry. He obtained and reviewed financial information and traveled to the Kerry plant to view the equipment and discuss the operation with MacDonald and others. In January of 1995, Polystar made a conditional offer to purchase the shares of Bender and his associates for $377,500.00. That offer was accepted by Bender on January 23, 1995, with the understanding that it was conditioned upon a favorable report following due diligence. During the first part of February 1995, Polystar sent Mitchell Kirshner (Kirshner) to conduct a due diligence investigation of Kerry. Kirshner identified several areas of concern which he then communicated to Friedman.

However, before rescinding his offer to Bender based upon the due diligence discoveries, Friedman invited Smith to come to Montreal, Canada to discuss the possible purchase of Smith's shares. On approximately February 20, 1995, Smith met with Friedman in Montreal, Canada. The day after, on February 21, 1995, Friedman wrote to Bender withdrawing his offer to purchase Bender's shares.

On March 6, 1995, Friedman obtained from Mark Wilenkin, of Mark One Machinery in New Jersey, a desktop appraisal of Kerry's equipment. Sometime during this period, Robert Smith contacted Stephen Young (Young) of Barnett to arrange a meeting, which was to take place at Barnett's offices on March 8, 1995. Smith indicated that he intended to bring representatives of Polystar

to the meeting. The March 8, 1995 meeting was attended by Young on behalf of Barnett, Friedman, Polystar's in-house counsel Sydney Sederoff, Polystar's Florida counsel Ralph V. Hadley, III, and Smith. Smith specifically requested that MacDonald not attend the meeting because it concerned "shareholder" issues. Significantly, while Smith cited shareholder issues in not inviting MacDonald, he similarly did not inform Bender, Kerry's largest shareholder, of the meeting or otherwise invite him to participate.

At the meeting, Kerry and Polystar informed Barnett that Polystar wanted to purchase the assets of Kerry. Kerry and Polystar requested that Barnett foreclose its loans, and then convey the assets to Polystar in exchange for payment from Polystar of all amounts owed on the loans. It was proposed that Barnett would then release Smith and Bender from their personal guaranties, and release a $100,000.00 certificate of deposit which Bender's construction company had pledged as additional collateral for Kerry's obligations to Barnett.

On March 10, 1995, Barnett faxed to Kerry a letter demanding payment in full of all amounts due under the loans. On March 15, 1995, Barnett and Kerry executed a document entitled Agreement Regarding Conditional Release of Indebtedness (Agreement). Therein, Barnett agreed to accept Kerry's assets in exchange for forgiveness of Kerry's obligations to Barnett, provided a third party purchased the assets from Barnett for an amount equal to the outstanding balance of Kerry's obligations to Barnett.

Contemporaneous with execution of the Agreement, Kerry executed a Bill of Sale transferring all of its assets to Barnett. At the same time and as part of the same transaction, Barnett executed a Bill of Sale transferring all of the Kerry assets to Polystar in exchange for payment of $807,702.81, which was the entire outstanding balance of Kerry's obligations to Barnett, including principal, interest, late fees, and attorneys' fees. The bank further required Kerry, Polystar and their principals to release Barnett from any liability in connection with the transfer.

Barnett also required Polystar and Friedman to execute an indemnification agreement for Barnett's protection.

On March 17, 1995, Smith directed Mac-Donald to prepare and distribute to Kerry's suppliers a letter informing them that Kerry would not be able to meet any of its obligations. That letter was received by both Huntsman and Pierson, and included the following language: "Please be advised that Barnett Bank Inc. has called all of Kerry Packaging Inc's loans and have [sic] foreclosed on all of our assets."

■ Polystar and Barnett cast the aforementioned transaction as the simple enforcement of a security interest under Article 9 of the Uniform Commercial Code. To the contrary, the court finds, as a matter of fact, that the transaction was a single, consensual, and voluntary transaction intended to convey the Kerry assets to Polystar free of any liabilities. Several facts lead the court to this conclusion. First, the transfer of assets was done at the request of Kerry and Polystar, and in a manner and at a time suspiciously convenient to all parties involved except Kerry's trade creditors.

Second, prior to the March 8, 1995 meeting, Barnett had no intent to foreclose the loans, had not delivered a written notice of default to Kerry, and had taken no acts toward carrying out a foreclosure. Moreover, Young had not requested authorization from his superiors nor received direction to foreclose the loans. In short, Barnett had not followed its normal course of business in conducting the "foreclosure" of Kerry's loans.

Third, the loans were not seriously in default on March 15, 1995. Each loan was current in payment, except the equipment loan, which was only two principal payments in arrears. Significantly, in September 1994, Barnett saw no impediment to renewing Kerry's line of credit at a time when it was three payments in arrears; this indicates that Barnett normally would not consider a two-payment arrearage to be an actionable default.

Finally, Young testified that, had Polystar not entered the picture to purchase Kerry's assets, Barnett did not in fact intend to foreclose Kerry's loans. Rather, he stated that Barnett would have unwound the deal and returned the assets to Kerry.

These facts and the timing of the transaction constitute more than adequate support for the court's conclusion that the transaction was intended to hinder, delay and defraud Kerry's creditors. Kerry, Polystar and Barnett were all aware that Kerry had substantial trade debt in an amount exceeding $1.5 million dollars. Further, Kerry, Polystar and Barnett were undoubtedly aware that by carrying out the transaction, Kerry would be left without sufficient assets to pay creditors. In knowing this and deciding to go forward nevertheless, defendants exhibited a disregard for Kerry's trade creditors which translates into defendants' intent to execute the underlying transaction and, in the process, avoid paying Huntsman and Pierson.

Several facts lead the court to this conclusion. First, Kerry, Polystar, and Barnett had good reason to believe that the consideration paid by Polystar was substantially less than the market value of the Kerry Assets. Such an understanding led Smith, on behalf of Kerry, to prepare and deliver the March 17, 1995 notice to its suppliers which created the misleading impression that Barnett had foreclosed its loans and concealed the fact that Polystar had actually acquired Kerry's assets. The court finds that the statement was intended to deter suppliers from scrutinizing the transaction.

Secondly, in connection with the transaction, Polystar paid $50,000.00 to Bender to help persuade him to consent to the transaction as a shareholder, and Polystar paid $175,000.00 to Smith. Although there was testimony that the money paid to Smith was intended to serve Polystar's business purpose, the weight of the evidence was that Smith requested the payment for his own purposes and Polystar agreed to pay it. The evidence was that Smith paid some or all of the money to a business partner in the Caribbean for the purpose of maintaining his interest in a venture that paid him approximately $30,000.00 per year. Polystar's explanation is also inconsistent with the fact that it required Smith to sign a promissory note agreeing to repay the $175,000.00 to

Polystar, which would be forgiven if he remained with the company for three years.

Finally, Barnett was aware of the risk that trade creditors may scrutinize the transaction and bring an action challenging it as a fraudulent transfer. Young testified that the indemnification agreement was intended to protect Barnett from precisely the type of claims now brought in this action by Huntsman and Pierson.

■ The court next turns to the factual issues surrounding the value paid for Kerry's assets. In short, the court finds that Barnett and Polystar paid less than reasonably equivalent value for Kerry's assets, by an amount in excess of Huntsman and Pierson's total claims with interest. Again, several factors convince the court of this fact. First, plaintiff's expert witness Michael Mard (Mard) testified that the value of the Kerry assets as a going concern was approximately $2.2 million. Defendants offered no testimony to the contrary.

Second, based on the financial statements and a physical inspection of the operation, Polystar valued the operation at over $3.1 million dollars in January of 1995. This fact is justifiably inferred from Friedman's offer to purchase the shares of Ralph Bender, in which Kerry offered to pay $377,500.00 for an equity position, which would involve the assumption of approximately $2.8 million in liabilities. Although Polystar's due diligence revealed a basis for some adjustments to its assessment of Kerry's value, even accounting for such adjustments, the offer supports the conclusion that Kerry was worth substantially in excess of $807,702.81. Similarly, Greg Rosshandler's offer in August of 1994 valued equity at $550,000.00 with assumed liabilities of over $3.0 million. Thus, the Rosshandler offer placed a total value on Kerry of over $3.5 million.

Third, the book value of Kerry's assets was over $2.0 million on March 15, 1995, with equipment of at least $1.4 million, inventory of at least $300,000.00 and accounts receivable of over $400,000.00. Finally, Fred LaDue, Barnett's equipment appraiser, established that a liquidation of the equipment, on site, in a commercially reasonable manner would have yielded approximately $1.0 million. Adding this to the accounts receivable and inventory yields a value of Kerry in excess of $1.7 million.

Hence, the court is not persuaded by Friedman's conclusory testimony that Polystar would not have been willing to pay more than $807,702.81 for the assets, particularly where it later readily paid an additional $225,000.00 to the Kerry shareholders to facilitate the transaction.

From the totality of the aforementioned facts, the court finds that Barnett, Polystar, Kerry, Smith, and others knowingly agreed together to carry out the transaction, and that each engaged in substantial acts to carry out the transaction, including but not limited to preparation and execution of the documents. Their actions severally caused plaintiffs' inability to collect the money owed them by Kerry, as those debts have been previously substantiated and quantified herein.

## II. Conclusions of Law

The facts established above moved Huntsman and Pierson to file the instant action to recover the amounts owed them. They have prevailed by way of default judgment on their claims against Kerry for the full amount owed, on the theories of breach of an open-account contract and collection on a promissory note (Counts I, II, and III). The remaining claims will be addressed in turn below.

Counts IV and V of plaintiffs' complaint are related and allege that the transaction through which Polystar acquired Kerry's assets was intentionally fraudulent as to Huntsman and Pierson and was consummated for a sum which was less than reasonably equivalent value, as proscribed by Florida's Uniform Fraudulent Transfer Act (the Act) which is codified at chapters 726.101–201 of the Florida Statutes. As such, plaintiffs seek to avoid that transfer to the extent required to satisfy the debt owed them by Kerry. *See* Fla.Stat. ch. 726.108(1)(a) (1995) (providing avoidance as a remedy).

■ Pursuant to chapter 726.105(1)(a) of the Act, a transfer by a debtor "is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made

..., if the debtor made the transfer ... with actual intent to hinder delay, or defraud any creditor of the debtor...." Fla.Stat. ch. 726.105(1)(a) (1995). In quantifying this statutory rule, Florida courts require plaintiffs to demonstrate that: (1) there was a creditor to be defrauded; (2) a debtor intending fraud; and (3) a conveyance of property which could have been applicable to the payment of the debt due. *Johnson v. Dowell*, 592 So.2d 1194, 1196 (Fla.Dist.Ct.App.1992) (citing *Wieczoreck v. H & H Builders, Inc.*, 450 So.2d 867, 873 (Fla.Dist.Ct.App.1984), *overruled on other grounds*, 475 So.2d 227 (Fla.1985)). A review of the facts established in the instant case, and clearly set forth above, demonstrates that plaintiffs have satisfied each of these elements, which justifies judgment in their favor on Count IV of the complaint.

Count V is predicated upon chapter 726.106(1) of the Act. That chapter provides that:

> A transfer made or obligation incurred by a debtor is fraudulent as to a creditor whose claim arose before the transfer was made or the obligation was incurred if the debtor made the transfer or incurred the obligation without receiving a reasonably equivalent value in exchange for the transfer or obligation and the debtor was insolvent at that time or the debtor became insolvent as a result of the transfer or obligation.

Fla.Stat. ch. 726.106(1) (1995). As the court's findings of fact reveal, each of the elements of this standard were satisfied in the instant case. Plaintiffs' claims arose prior to the transfer at issue in this case. As the valuations conducted by the parties and credited by the court show, less than reasonably equivalent value was given for Kerry's assets. Finally, the court found as a matter of fact that the transfer left Kerry without assets with which to pay creditors, which satisfies the element requiring post-transaction insolvency. Accordingly, plaintiffs have satisfied each element of their claim under chapter 726.106(1) of the Act, for which the court finds in their favor on that claim.

■ Count VI represents plaintiffs' claim for unjust enrichment. To succeed on a claim for unjust enrichment, plaintiffs must establish that: (1) they conferred a benefit on defendants of which defendants are aware; (2) defendants voluntarily accepted and retained the benefit conferred; and (3) the surrounding circumstances were such that it would be inequitable for defendants to retain the benefit without paying plaintiffs for it. *Peoples Nat'l Bank of Commerce v. First Union Nat'l Bank of Fla., N.A.*, 667 So.2d 876, 879 (Fla.Dist.Ct.App.1996). While the legal standard the *Peoples National Bank* court cited does not require that the benefit conferred upon the defendants be done so "directly," the court's analysis indicates that it must be. *See id.* ("plaintiff ... did not allege that it had directly conferred a benefit on the defendants ..."). In applying this rule of state law as the Florida court did, the court must find that plaintiffs in the instant case have likewise failed to allege that they directly conferred any benefit on Barnett or Polystar, even though they arguably did so indirectly. Indeed, plaintiffs were unaware of any involvement by Barnett or Polystar until after plaintiffs supplied Kerry, which would be the only benefit plaintiffs could have conferred upon Barnett and Polystar in the instant case. Hence, the court finds for Barnett and Polystar on Count VI because plaintiffs did not allege, and the evidence of record does not support a finding that, they directly conferred any benefit on Barnett or Polystar.

■ However, the Count VI analysis runs differently as to Smith. The court finds no impediment to concluding that Smith, being a principal of Kerry and the one most familiar with its condition and operations, knowingly accepted a benefit directly conferred by plaintiffs in the form of raw materials supplied on account. Smith, on behalf of Kerry, accepted the materials knowing intimately Kerry's financial and operational condition. He then, after meeting with Friedman, at very least acquiesced in the structuring of the transaction underlying this lawsuit. Given these facts, it would be most inequitable for Smith to accept the benefit conferred by plaintiffs without compensating them. As such, the court finds for plaintiffs on Count VI of their complaint as to defendant Smith only.

Finally, Count VII contains a claim for civil conspiracy. In Florida, a conspiracy is a combination of two or more persons by concerted action to accomplish an unlawful purpose or to accomplish a lawful purpose by unlawful means. *Nicholson v. Kellin*, 481 So.2d 931, 935 (Fla.Dist.Ct.App.1985). To succeed on a claim for civil conspiracy, plaintiffs must establish: (1) a conspiracy between two or more parties; (2) the doing of an unlawful act or a lawful act by unlawful means; and (3) the doing of some overt act in pursuance of the conspiracy. *Sonnenreich v. Philip Morris, Inc.*, 929 F.Supp. 416, 419 (S.D.Fla.1996). Moreover, Florida courts have held that "there can be no independent tort for conspiracy ... unless the plaintiff can show some peculiar power of coercion possessed by the conspirators by virtue of their combination, which power an individual would not possess...." *Peoples Nat'l Bank*, 667 So.2d at 879.

The facts established by the court in the instant case demonstrate clearly that Kerry, Polystar, Barnett, and Smith combined to facilitate and effectuate the lawful goals of eradicating the debt owed Barnett by Kerry and transferring Kerry's assets ultimately to Polystar. However, in the process, Barnett failed to follow its foreclosure policy and procedure and failed to satisfy the dictates of Article 9 of the Uniform Commercial Code for executing such a transaction. As such, the court finds the defendants accomplished a lawful purpose by ultimately unlawful means. Further, the several meetings by the defendants and the proposal by Polystar to purchase Kerry's assets from Barnett constitute overt acts in furtherance of the conspiracy. Finally, the involvement of Barnett and its apparent power of foreclosure gave defendants collectively power or apparent power that an individual would not have otherwise had.

Defendants claim that chapter 726.109(5)(b) of the Act insulates them from liability stemming from the transfer of Kerry's assets to Barnett and ultimately to Polystar. That chapter provides that "[a] transfer is not voidable under chapter ... 726.106 if the transfer results from ... (b) [e]nforcement of a security interest in compliance with Article 9 of the Uniform Commercial code." Fla.Stat. ch. 726.109(5)(b) (1995). In addition to the fact that the court has already concluded that defendants failed to follow the dictates of Article 9, the chapter upon which defendants rely must be read in conjunction with another important chapter of the Act. That section provides:

(2) For purposes of §§ 726.105(1)(b) and 726.106, a person gives a reasonably equivalent value if the person acquires an interest of the debtor in an asset pursuant to a *regularly conducted, noncollusive foreclosure sale* or execution of a power of sale for the acquisition or disposition of the interest of the debtor upon default under a mortgage, deed of trust, or security agreement.

Fla.Stat. ch. 726.104(2) (1995) (emphasis added). To reiterate, the court finds that the sale of Kerry's assets first to Barnett and then to Polystar was not a regularly conducted, noncollusive foreclosure sale within the meaning of the Act. As such, chapter 726 .109(5)(b) of the Act is of no defensive value to defendants in the case at bar. Accordingly, the court finds in favor of plaintiffs as to Count VII of their complaint against each defendant.

### III. Conclusion

In accordance with the foregoing findings of fact and conclusions of law, the court finds for plaintiffs Huntsman and Pierson on their claims for fraudulent transfer for less than reasonably equivalent value (Counts IV and V) as to each defendant jointly and severally, for unjust enrichment (Count VI) as to defendant Smith only, and for civil conspiracy to execute a fraudulent transfer (Count VII) as to each defendant jointly and severally. As such, the clerk of the court is directed to enter a money judgment against Barnett, Polystar, and Smith, jointly and severally, and in favor of Huntsman in the total principal amount of $235,198.09 plus accrued interest of $79,897.18 as of January 1, 1998; a money judgment against Barnett, Polystar, and Smith, jointly and severally, and in favor of Pierson in the total principal amount of

$171,759.65 plus accrued interest of $49,-559.82 as of January 1, 1998.