In re PSI INDUSTRIES, INC., Debtor.

Barry R. Shear, as liquidating trustee for PSI Industries, Inc., Plaintiff,

v.

Carol Seminara, Mirco Vietti, Dominick Seminara, Lisa Seminara Davidson, and Debbie Vietti, Defendants.

Bankruptcy No. 99–33737–BKC–SHF–11.

Adversary No. 01–3075–BKC–SHF–A.

United States Bankruptcy Court,
S.D. Florida,
Palm Beach Division.

Nov. 5, 2003.

Bruce A. Katzen, Kluger, Peretz, Kaplan & Berlin, P.L., Miami, FL, for plaintiff.

Kenneth J. Dunn, Feder & Dunn, P.A., Coral Springs, FL, for defendants.

## MEMORANDUM OPINION, FINDINGS OF FACT, AND CONCLUSIONS OF LAW

THOMAS S. UTSCHIG, Bankruptcy Judge.

There is an old saying that a picture is worth a thousand words. This case revolves around the absence of any such clear images, as the parties have been forced to introduce a host of documentary exhibits, depositions, and witness statements in an effort to paint a *written* picture of what exactly happened to the debtor's film stock and disposable camera business. The Court's task is to determine whether there was any wrongdoing on the part of the defendants, all of whom were directors or officers of the debtor. This case was tried before the Court on June 9 and June 12, 2003. The plaintiff was represented by Bruce A. Katzen, while the defendants were represented by Kenneth J. Dunn. Based upon the record, the Court finds as follows.

The plaintiff is the liquidating trustee for PSI Industries, Inc. PSI was a Florida corporation with its principal offices in Boca Raton, Florida. PSI filed a chapter 11 petition on July 29, 1999. A liquidating plan of reorganization was confirmed on May 31, 2000. The defendants were all officers or directors of the debtor until they resigned those positions shortly before the debtor's bankruptcy filing. Dominick Seminara was the founder, chief executive officer, and chairman of the board of directors of PSI. Mirco Vietti, who is also Dominick's son-in-law, served as a director and vice-president of the debtor. Carol Seminara, Lisa Seminara Davidson, and Debbie Vietti were also all listed as directors and vice-presidents of the debtor.

The plaintiff alleges that during 1997 and 1998, the defendants engaged in a pattern of conduct which "looted" the debtor of millions of dollars in assets. The specifics of these schemes will be outlined below, although the general allegation is that the defendants artificially inflated the debtor's net worth, received millions of dollars in loans based upon this artificial valuation, and then siphoned off the funds through a variety of fraudulent disbursements. PSI began as a family business in the mid–1980s, primarily selling film stock. In the mid–1990s, the company became involved in the "disposable camera" business, most notably in the area of recycled cameras. According to the testimony at trial, there is a market for "recycled" camera shells—primarily shells of disposable cameras manufactured by Kodak or Fujifilm. Once those cameras have been used, the shells are sold in a secondary market and repackaged (usually in China or another location with low production costs). The repackaged cameras are then sold as "store" brands. According to the company's financial records, it held hundreds of thousands of such cameras in inventory,

and had also attempted to sell what was known as "message cameras."[1] In essence, PSI was a distributor of disposable cameras, film, and film stock.

At its height, PSI employed approximately forty employees, and it became a publicly-traded company in September of 1996. Not quite three years later, it filed bankruptcy. Approximately three months prior to the bankruptcy filing, Dominick Seminara resigned from his position as chief executive officer, and Benjamin Cohen was elected to succeed him. Vietti was fired by Cohen shortly thereafter, and the other Seminara-related directors resigned from the board at about the same time. When Cohen took over as CEO, PSI's balance sheets indicated that the company had over $6 million in equity, primarily in its inventory of film stock and so-called "message" and premium camera inventory. The company hired a financial consulting firm to assist in determining how to alleviate the company's cash flow problems. Barry Shear, who now serves as the liquidating trustee of the debtor, was initially engaged to assist in that consulting arrangement. According to Shear, he entered the "assignment" expecting to work with PSI to reduce its inventory, which was valued at over $12 million on the company's audited financial statements.

Unfortunately, when he visited the company's Boca Raton headquarters, he discovered a dramatically different picture (no pun intended). According to Shear, the company's balance sheets "substantially overstated" its inventory. Most notably, there were no cameras or film inventory. Instead, there were thousands of empty camera shells sitting in the warehouse and reflected on the company's books as finished cameras, and very little film stock at all. Shear stated that he found "most" of the company's inventory was either materially overvalued or nonexistent, and the financial statements required a write-down of approximately $12 to $14 million.

The present action contends that Dominick Seminara, together with Marco Vietti and the other family members named as defendants, committed numerous frauds against the company and "looted" it of literally millions of dollars. The challenge in such a case as this is to demonstrate that the company's losses were due to fraudulent conduct and not simply the result of poor accounting, mismanagement, or the like. As there is often no clear trail that documents the disappearance of the money (or, perhaps as importantly, the reappearance of the funds in the hands of the defendants at some later date), it becomes necessary to piece together the facts in order to create a coherent whole. Likewise, cases like this typically lack direct evidence of fraudulent intent, and it must be determined from the totality of the circumstances. In this regard, the plaintiff has attempted to document the myriad number of ways in which the debtor's books and records were manipulated in order to show, as the plaintiff's expert stated at trial, that this transcends a "poor accounting department."

First, the plaintiff points to a variety of "loan" transactions made to the various defendants which allegedly inflated the debtor's assets. On January 15, 1998, each of the defendants executed promissory notes in favor of PSI. Carol Seminara executed a promissory note in the amount

---

1. According to testimony at trial, PSI became involved in the distribution of "message" cameras, which were a variant of disposable cameras. These cameras automatically inserted a caption (such as "Happy Birthday" or the like) onto the pictures as they were taken.

of $12,040.81, which had an ending loan balance as of July 31, 1999, of $19,770.69. Mirco Vietti executed a promissory note in the original amount of $83,970.44; the ending balance on his loan account was $39,748.81. Dominick Seminara executed a note in the original amount of $414,063.63, the ending balance of which was $279,108.71. Lisa Seminara Davidson executed a note in the amount of $39,551.00, and the ending balance was the same. Debbie Vietti executed a note in the amount of $5,890.00, which likewise remains unpaid.

These loans were capitalized as assets on PSI's financial statements. Although Dominick Seminara contended that these "loans" were actually some form of salary or expense reimbursement, they consistently appeared as corporate "assets" on financial statements and reports to the Securities and Exchange Commission, including the company's Annual Form 10–KSB for the year ending December 31, 1998. While Seminara contends that the loans were "satisfied" by way of releases executed on April 15, 1998, the documents indicate otherwise. The loans appear as assets on the 1998 Annual Form 10–KSB and on the company's 1998 financial statements.[2] In any event, these releases do not appear to have been properly executed or ratified by the company.[3] In addition, the loans do not appear to have benefitted the company, and it appears that they may have been a vehicle to funnel money out of the corporation.[4]

Dominick Seminara attempted to place the blame for these problems on the shoulders of the company's accounting department. There was repeated testimony about the "horrendous" accounting department. It is true that poor accounting can lead to problems; it can also be a haven for fraudulent conduct. It appears from the record that Seminara had far more control over the financial statements and the accounting department than he indicated at the trial. Shear's testimony, the deposition testimony of Ben Cohen, and the testimony of others reflected that Seminara was largely responsible for what appeared on the company's books. He was hardly the laissez faire businessman he represented himself to be at trial.

Another of the plaintiff's complaints is that both Mirco Vietti and Dominick Seminara acquired stock of PSI without paying for it. On September 30, 1997, Vietti acquired 180,606 shares of stock in exchange for a promise to pay $19,873.26. On January 31, 1999, an additional 200,000 shares of stock were issued to Vietti in exchange for a stock subscription receivable of $180,000.00. Likewise, Seminara received a similar amount of stock in exchange for the same promises of payment. As such, each man arguably owes $199,873.26 for the stock they received but did not pay for. Each of these debts was listed as a "stock subscription receivable" on the company's financial statements, despite the fact that neither obligation was ever paid.

2. In February of 1999, Seminara wrote to Feldman Sherb and signed off on the "management representation letter" required in connection with the 1998 annual audit. Among those representations were that the company's financial statements accurately reflected all "related party transactions," including sales, purchases, loans, transfers, leasing arrangements, or guarantees.

3. The deposition testimony of Ben Cohen indicates that there was no independent director approval of the releases, no board authorization for them, nor any directors' meeting minutes reflecting forgiveness of the loans.

4. It also appears that the family members used company funds to pay personal credit card bills, luxury car leases, and various other expenses.

One intriguing aspect of this case is the involvement of the outside auditors, especially given the attention such auditors have received in high-profile cases like World Com and Enron. This case appears to be another reflection of "auditor shopping," in which an auditor was chosen not on the basis of skill but rather in order to preclude discovery of what was actually going on. Initially, the debtor's outside auditing firm was Ernst & Young. When completing the audit of the 1997 financial statement, Ernst & Young required PSI to make a $1.5 million audit adjustment reversing a preferred stock transfer allegedly booked on December 31, 1997. Richard Proodian, the debtor's chief financial officer, wrote Seminara and stated that Ernst & Young "will not let anything slide as they did for 1996." [5]

Shortly after making these corrections, Ernst & Young was replaced by Feldman Sherb, another accounting firm (the plaintiff repeatedly made reference to the company's "second rate" status, but the Court makes no finding in that regard). After Feldman Sherb's retention, another "stock transfer" which was virtually identical to the one discounted by Ernst & Young appeared on the company's financial statements. Feldman Sherb did not question the transfer, and issued audited financial statements for the years ending December 31, 1997, and December 31, 1998, which depicted a company with what the plaintiff

called a "dramatically improving financial condition." In point of fact, barely three months after the release of Feldman Sherb's positive 1998 audit, PSI filed bankruptcy. The company was not only in financial disarray, it was in financial distress. Feldman Sherb ultimately withdrew the audit opinion and admitted the financial statements were materially false and misleading.[6]

According to the plaintiff, it was after the hiring of Feldman Sherb that the defendants' fraudulent activities escalated. The basic plan was to "overstate" the assets of PSI in order to obtain additional new financing from the company's primary creditors, including LaSalle Bank and trade creditors such as Eastman Kodak and Polaroid. Those funds were then allegedly drained from the company by the defendants.[7] It is undisputed that the company's debts, such as its obligation to LaSalle Bank, went unpaid. Essentially, at the time PSI was represented to the outside world to be a viable company with significant assets, it was in fact an insolvent corporate shell with little, if anything, in the way of value, and its financial statements overstated its actual assets by more than $10 million.

The plaintiff's expert characterized this case as one involving "multiple frauds," and the plaintiff's voluminous pleadings attempt to document them. One such allegation involved potential fraudulent pay-

---

5. While it is not clear that this statement was made directly in connection with the stock transfer, it is an indication that there was concern about Ernst & Young's scrutiny of the company's records.

6. The liquidating trustee brought an action against Feldman Sherb for failing to detect the fraud in an action styled *Shear v. Feldman Sherb, et al.*, Case No. 01–8795–CIV–HURLEY. That action was subsequently settled through the payment of $6 million to the debtor's estate by Feldman Sherb.

7. In general, the way this inflation was achieved was through the entry of shareholder loans as assets, the issuance of stock purchase agreements, and the use of false or "dummy" inventory. However, it also appears that film inventory which would have been provided by Eastman Kodak and/or Polaroid was diverted or otherwise "disappeared" under Seminara's stewardship.

ments and/or kickbacks between PSI and a company called "Sino–Sound." Shear stated in his direct testimony that he discovered a wire transfer log that indicated approximately $1.8 million was transferred to Sino–Sound from January 1998 to June 1999. These transfers were in addition to any checks made payable to Sino–Sound, and according to Shear approximately $1.25 million of these transfers were for no consideration whatsoever. Based on records received from Sino–Sound's bank, the plaintiff contends that the funds were sent to Sino–Sound and then diverted to other entities controlled by the defendants, such as Ottima, Inc. (a Florida company formed by a PSI employee and Mirco Vietti's brother), and PSI Asia, Ltd., a Cayman Islands corporation created by Seminara.

While the plaintiff contends that it is significant that Ottima, Inc., was ultimately renamed Power Supply, Inc. (thus ending up with the same acronym as the debtor PSI), there is very little direct information to connect Vietti or Seminara to this business. Shear testifies that Mirco Vietti was fired by Cohen, the successor CEO of PSI, and that after the firing Vietti "went to work for Ottima/Power Supply." He also says that he once called Ottima/Power Supply and Dominick Seminara answered the phone. Neither of these statements clearly indicate that the defendants were utilizing Ottima to funnel money out of PSI for their own benefit.

It is true, however, that funds were then transferred from Sino–Sound to Ottima, despite the fact that Ottima did not do any business with Sino–Sound until 2002. There also appear to have been a number of false invoices created to conceal some of these transactions. For example, PSI paid Sino–Sound on four different invoices despite the fact that there was no evidence that PSI ever ordered the merchandise and even though it does not appear that Sino–Sound ever shipped the merchandise.[8] There were repeated instances of payments on invoices for which there was no shipping, receiving, or related documentation.[9] At trial, Seminara had no explanation for these transfers, and denied any knowledge of them.[10]

Another aspect of the alleged scheme was in the apparent diversion of film inventory. In the spring of 1999, PSI purchased approximately $4 million of film from Kodak, Polaroid, AGFA, and Fuji. Shear testified that this film stock was listed among PSI's inventory assets when he became involved with the company. However, during his investigation he found neither the film nor any indication that the company had sold the film (or received any payments for it). Instead, Shear found that the inventory was removed from the company's books via "negative receipts, sales at a zero-dollar price, or large inventory adjustments." He contends that the film that vanished from PSI's inventory was worth at least $993,434.52.

Shear and his expert witness, Alan Goldberg, also contend that the defendants engaged in "lapping," a practice in which

---

8. Likewise, the merchandise reflected in these invoices does not appear to have been receipted by PSI, and it never appeared on PSI's inventory system.

9. For example, the plaintiff points to $450,000.00 in "payments" to Sino–Sound on invoices relating to 300,000 single use cameras which never appear on any of the records of PSI.

10. Steve Kwan, the principal of Sino–Sound, declined to answer any questions regarding these transfers during his deposition, instead asserting his Fifth Amendment right against self-incrimination. Kwan was also involved in some of the alleged fraudulent stock purchase schemes, for which stock was issued in exchange for cameras which were never entered into PSI's inventory.

legitimate payments from creditors are utilized to cover up unauthorized withdrawals from the company's accounts. They contend that Seminara and Vietti misapplied a number of payments, such as a $603,979.20 payment from Family Dollar. Instead of being applied to Family Dollar's account, a portion of these funds were apparently used to cover deficits on other accounts. A wire transfer from PSI's own account then covered the shortfall in the Family Dollar account.[11]

Some of the most damaging evidence concerns what the defendants had labeled the "C–Suffix" inventory. This was an inventory notation referencing cameras which were to have been in the debtor's warehouse pursuant to the company's Boca Raton inventory information. Essentially, each C–Suffix item corresponded to a real inventory item; the allegation is that the defendants simply added a "C–Suffix" to each real item in order to create a fictitious class of inventory. These cameras suddenly appeared in the debtor's inventory system by way of an "adjustment entry" rather than an actual purchase transaction, and the debtor supposedly transferred these cameras to another entity in a rather suspicious manner.[12] The company's records reflected a number of "C–Suffix" inventory items, including a variety of message cameras (the anniversary message camera, the "happy birthday" message camera, the vacation message camera, and more). Prior to Feldman Sherb's first audit, these inventory items were valued at $3,869,277.40, yet another example of the "overstatement" of the debtor's assets.

In addition, the company's inventory indicated that there were 107,296 cameras in inventory, allegedly worth $2.90 each. However, when Shear reviewed the actual inventory, all he found were recycled camera shells worth about 60 cents each. PSI also purchased more than a million other shells from another vendor at prices of about 15 cents each. These shells were also represented to be "finished cameras" on the company's balance sheets. At trial, Seminara claimed that someone (supposedly an accountant or the outside auditors) had told him he could add all the costs of "finishing" the cameras to the price of the shells in order to determine an inventory value for them. He could not identify the person who told him this. Adding such charges before actually expending the costs would appear to be contrary to generally acceptable accounting principles, and it appears that this tactic was simply

---

11. In addition to covering possible illegitimate withdrawals from the company's accounts, this practice also allowed the company's accounts receivable to appear in order. In the context of this wire transfer, it appears that the ultimate result was to increase Dominick Seminara's "loan receivable," which as indicated previously was reflected as an asset of the debtor. There is no logical reason for Seminara to essentially borrow from PSI in order to pay down the debt of one of the company's creditors. At the trial, Seminara did not offer any explanation for this unorthodox example of "bookkeeping."

12. The debtor's records indicate that the "C–Suffix" inventory was sold to a company called Gain United International Ltd., alleged-

ly in exchange for $4.5 million of camera shells located at a warehouse in China. While bills of lading were prepared to reflect the transfer, a representative of the freight company indicated that they could find no indication of any such shipments in their records. Further, the location to which the cameras were allegedly delivered was an apartment building in Beverly Hills. It appears that this building is the residence of Steve Kwan, the Sino–Sound representative who refused to answer deposition questions on Fifth Amendment grounds. And finally, when Shear approached Mass Chance, the company with the warehouse in China, Mass Chance denied holding any camera shells for the debtor.

an effort to inflate the debtor's assets from a balance sheet perspective.

The complaint in this case seeks damages for the unpaid promissory notes, unpaid stock subscription receivables, fraudulent transfers, conversion, and civil theft. The only witnesses at trial on behalf of the defendants were Dominick Seminara and Richard Proodian, the former CFO of the company. Neither man's testimony was particularly helpful in clarifying PSI's prepetition financial situation or accounting methods. In fact, it is clear that something occurred regarding the company's books, and that what occurred was fraudulent. For example, the use of the "C–Suffix" inventory appears to be exactly what the plaintiff contends, namely a device to artificially inflate the company's value, as does the listing of empty camera shells as actual finished cameras.

Seminara contended that the various loans to himself and others in his family were somehow "salary" payments, but he had no cogent explanation for why the loans then appeared on the company's books as outstanding receivables (and hence assets, again artificially inflating the company's net worth). And the disappearance of film inventory, along with the mysterious payments to Sino–Sound, when taken together, clearly indicate that there was a scheme to strip the company of its assets. As the plaintiff has pointed out, the Court must consider whether the so-called "badges of fraud" exist in this case.

■ Under Fla. Stat. § 726.105, a transfer is fraudulent as to present or future creditors if the debtor made or incurred the obligation:

(a) With actual intent to hinder, delay, or defraud any creditor of the debtor; or

(b) Without receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor:

1. Was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction; or

2. Intended to incur, or believed or reasonably should have believed that he or she would incur, debts beyond his or her ability to pay as they became due.

The statute further provides that when considering the defendant's "actual intent to hinder, delay, or defraud," the Court may consider, among other factors, the following:

(a) The transfer or obligation was to an insider.

(b) The debtor retained possession or control of the property transferred after the transfer.

(c) The transfer or obligation was disclosed or concealed.

(d) Before the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit.

(e) The transfer was of substantially all the debtor's assets.

(f) The debtor absconded.

(g) The debtor removed or concealed assets.

(h) The value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred.

(i) The debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred.

(j) The transfer occurred shortly before or shortly after a substantial debt was incurred.

(k) The debtor transferred the essential assets of the business to a lienor who transferred the assets to an insider of the debtor.

 Essentially, in order to establish a "fraudulent conveyance" under Florida law, the creditor (in this case the liquidating trustee) must demonstrate that there was (i) a creditor to be defrauded; (ii) a debtor intending fraud; and (iii) conveyance of property that could have been applicable to payment of the debt due. *Huntsman Packaging Corp. v. Kerry Packaging Corp.*, 992 F.Supp. 1439 (M.D.Fla.1998); *In re Young*, 235 B.R. 666 (Bankr.M.D.Fla.1999). Courts applying Florida's version of the Uniform Fraudulent Transfer Act, like courts applying the bankruptcy code's fraudulent transfer provision, rely on "badges of fraud" as circumstantial evidence of fraudulent intent. *In re American Way Service Corp.*, 229 B.R. 496 (Bankr.S.D.Fla.1999). Given the difficulties in establishing a transferor's actual intent, courts generally look at the totality of the circumstances and the "badges of fraud" surrounding the transfers; while a single badge of fraud may create only a suspicious circumstance, several of them together may afford a basis to infer fraud. *In re World Vision Entertainment, Inc.*, 275 B.R. 641 (Bankr.M.D.Fla.2002).

In this case, it is clear that there were efforts to siphon away the assets of the company. LaSalle Bank and PSI's trade creditors, most notably Kodak and Polaroid, had extended significant amounts of credit, largely based upon the company's purported excellent financial shape. While those debts were outstanding, Seminara engaged in a pattern of fraudulent conduct. Transfers of property were concealed, false bills of lading were produced to document shipments that never occurred, payments were intentionally misapplied, inventory was diverted, the fictitious "C–Suffix" inventory was created, and hundreds of thousands of camera shells worth a few cents each were represented as finished cameras. All of this evidences an intent to "hinder, delay, or defraud" creditors, especially since it is clear that significant portions of the company's value never actually left Seminara's control.[13]

 The plaintiff likewise seeks to recover for conversion of corporate assets. In order to recover for conversion, the plaintiff must demonstrate a right to property, a demand for the return of that property, and the defendants' refusal to return the property. *Ginsberg v. Lennar Florida Holdings, Inc.*, 645 So.2d 490 (Fla. Dist.Ct.App.1994). As to Dominick Seminara, the Court finds that the plaintiff has met his burden as to these elements.

 The plaintiff also alleges that the defendants are guilty of civil theft under Fla. Stat. § 812.014. Section 812.014 provides that a person commits the crime of "theft" if he or she knowingly obtains or uses the property of another with intent to deprive the other person of a right to the property or appropriate it to his or her own use. If the plaintiff is able to demonstrate conduct which rises to the level of civil theft under § 812.014, Fla. Stat.

---

**13.** For example, since the C–Suffix inventory never left the debtor's warehouse, at least via the fraudulent bills of lading, Seminara either maintained possession of the cameras (presuming for a moment that they ever existed) or the money lent to the debtor based upon the misleading financial statements. Similarly, by inflating the value of the camera shells, Seminara obtained significantly more in credit than he otherwise would have received. Yet those funds have disappeared as well.

§ 772.11 allows for the imposition of attorney's fees and treble damages. Specifically, that section reads:

> Any person who proves by clear and convincing evidence that he or she has been injured in any fashion by reason of any violation of ss 8.12.012–812.37 or s. 825.103(1) has a cause of action for threefold the actual damages sustained and, in any such action, is entitled to minimum damages in the amount of $200, and reasonable attorney's fees and court costs in the trial and appellate courts.

In this case, the Court declines to find that the plaintiff has proven by "clear and convincing evidence" that Seminara committed civil theft as defined under Florida criminal law. As such, the Court does not believe that the imposition of attorney's fees or treble damages is appropriate under the facts of this case.[14]

In truth, it is not the existence of a fraudulent scheme that the Court finds problematic in this case. Rather, it is the extent to which the plaintiff presumes all of the defendants were naturally part of this scheme simply because they were members of the board of directors. When questioned at trial, Shear admitted that he had no evidence—other than their presence on the board of directors—which would suggest that Carol Seminara, Debbie Vietti, and Lisa Seminara Davidson actively participated in any fraud, looting of corporate assets, or the like. Likewise, when questioned regarding Mirco Vietti's role, Shear indicated that Vietti's presence as an officer of the company, as well as his alleged involvement in corporations which may have received funds from PSI, were

the primary evidence of Vietti's participation in the frauds.

However, it is clear that Seminara himself was the one signing off on the correspondence with Sino–Sound and that he was in control of the entries on the company's financial statements. A number of the records, including the deposition testimony of Ben Cohen, reflected that Seminara was "the one" who would have determined to use the C–Suffix inventory or value the camera shells at the price of finished cameras. It is less clear that Vietti had such control. Shear indicated, for example, that Michael Caruso, a member of the company's accounting department, had testified during a deposition that the C–Suffix inventory was created "at the direction of senior management." There was no direct statement of who "senior management" was. The lack of any direct connection between Vietti and the financial shenanigans, or any specific evidence which points to Vietti's control over the debtor's financial affairs, is quite troubling.

 The burden of proof here is on the plaintiff to demonstrate the validity of the claims by a preponderance of the evidence. As to the promissory notes, the Court agrees that the notes are due and owing. The only defense raised to these claims is that the company "released" the obligations. The Court agrees with the plaintiff that the releases were not properly executed on behalf of the company and are not binding. Further, they occurred at a time when the company was insolvent, and were given for less than reasonably equivalent value. Accordingly, they constitute fraudulent transfers even if the re-

---

**14.** This should not be taken as a suggestion that the plaintiff did not amply document the fraudulent conduct of the defendant. The Court believes that Seminara engaged in extensive fraudulent behavior and stripped as-

sets from the debtor in a wide variety of ways. However, the Court does not find that the evidence clearly meets the intermediate level of scrutiny required for the imposition of treble damages.

leases were otherwise effective. The plaintiff is entitled to judgment on these loans as follows: against Carol Seminara in the amount of $19,770.69; Lisa Seminara Davidson in the amount of $39,551.00; Debbi Vietti in the amount of $5,890.00; Mirco Vietti in the amount of $39,748.81; and Dominick Seminara in the amount of $279,108.71.

■ Likewise, Dominick Seminara and Mirco Vietti each owe the debtor on the stock subscription agreements. The releases of these debts were not properly executed on behalf of the company, and otherwise constitute fraudulent transfers as the company released the obligation for less than equivalent value. Therefore, the plaintiff should have judgment against each of these defendants for $199,873.26.

■ On the claims of fraud, looting, civil theft, and conspiracy, the Court finds that the plaintiff has not met its burden of proof as concerns Carol Seminara, Lisa Seminara Davidson, or Debbie Vietti. There is no evidence that they actively engaged in any wrongful or fraudulent behavior, other than their presence on the debtor's board of directors. It is true that a conspirator need not take part in the planning, inception or successful conclusion of a conspiracy. *Donofrio v. Matassini*, 503 So.2d 1278 (Fla.Dist.Ct.App.1987). However, the conspirator does need to know of the scheme and assist in some way. Here, the plaintiff did not demonstrate knowledge or assistance. The plaintiff should have demonstrated some level of involvement, even if it was only minimal, and he did not. Shear's own testimony was that his conclusion was based upon their presence on the board of directors, nothing more. The Court finds that insufficient.

■ As concerns Mirco Vietti, it is a much closer issue, but the Court still finds that the plaintiff did not provide sufficient evidence of his participation in the overall "looting" scheme. Again, while Vietti appears to have been involved in the day-to-day operations of the debtor (something which does not appear true of the other conspiracy defendants), there was no evidence of his "knowledge" of the scheme. The plaintiff seeks to have the Court infer from the circumstances that he must have known what was going on. As indicated before, this is a very close determination. Unfortunately, the Court cannot agree that Vietti's knowing participation is evidenced by the circumstances.

■ However, the Court must conclude that the plaintiff has successfully demonstrated that Dominick Seminara was responsible for looting the company of assets by way of "multiple frauds," as the plaintiff's expert stated. The testimony reflected that Dominick Seminara controlled PSI until the time of his resignation. He had full access to PSI's financial records, he controlled the company's financial records, and he was the one who made the decisions regarding what information was displayed on the company's financial statements.

His efforts to place the blame on a "horrendous" accounting department are ineffective because the accounting problems documented by the plaintiff are too large, and too numerous, for them to simply be routine errors. The totality of the circumstances can lead to no other conclusion but that a large scale effort to strip the debtor of its assets was underway. In this regard, the Court is less concerned with such things as the "stock transfers" that did little more than marginally inflate the debtor's balance sheets. The key determination for the Court is the value of the assets which vanished from the debtor's inventory through Seminara's manipulation of the debtor.

While it is difficult to determine the exact amount "looted" from the debtor, it is clear that any award should include $993,434.52 for the film inventory which vanished, together with the value of the "cameras" which were actually nothing more than shells. By utilizing the camera shell entries to inflate the company's books, Seminara was able to obtain financing which was then siphoned from the company through some of the avenues outlined previously. As such, the disparity in valuation appears to be a fair indication of the amount converted by the defendant. Based upon the records, a fair valuation of the amount siphoned from the company through this tactic appears to be $2,996,780.80. The Court is not convinced that the evidence supports judgment for any additional amounts.

Accordingly,

IT IS ORDERED that the plaintiff shall have judgment against the defendants as follows: against Carol Seminara in the amount of $19,770.69; against Lisa Seminara Davidson in the amount of $39,551.00; against Debbi Vietti in the amount of $5,890.00; against Mirco Vietti in the amount of $239,622.07; and against Dominick Seminara in the amount of $4,469,197.29.