## In re McCARN'S ALLSTATE FINANCE, INC., Debtor(s).

### Andrea P. Bauman, Chapter 7 Trustee, Plaintiff(s),

v.

### Ray Bliese, Robert G. Burchette, Jr., Edward Camp, Richard V. Coyer, National Exchange, Inc., Defendants.

Bankruptcy No. 02–19766–8W7.

Adversary Nos. 03–0566, 03–0568, 03–0570, 03–0682, 03–0652.

United States Bankruptcy Court, M.D. Florida, Tampa Division.

June 30, 2005.

---

Keith S. Shotzberger, Noel Boeke, Maegen E. Peek, Holland & Knight LLP, Tampa, FL, for Chapter 7 Trustee.

Roberta A. Colton, Nathan A. Carney, Trenam, Kemker, Scharf, Barkin, Frye, O'Neill & Mullis, P.A., Tampa, FL, for Defendant Edward Camp.

Herbert R. Donica, Tampa, FL, for Debtor.

### MEMORANDUM OPINION ON MOTIONS FOR SUMMARY JUDGMENT

MICHAEL G. WILLIAMSON, Bankruptcy Judge.

A "Ponzi scheme" is a fraudulent investment arrangement in which returns to investors come from monies obtained from new investors rather than an underlying business enterprise. Establishing the existence of a Ponzi scheme is sufficient to prove a debtor's actual intent to defraud under either the Bankruptcy Code fraudulent transfer provision found in Bankruptcy Code section 548 or the Florida fraudulent transfer provision found in Florida Statutes section 726.105.

The Defendants in this adversary proceeding were brokers who received trans-

fers in the form of commissions for the initial sales and later renewals of investment notes. As the initial transferees of transfers made in connection with a fraudulent Ponzi scheme, the Defendants are liable to the Trustee for all of the commissions received in connection with the Ponzi scheme—even if they are completely innocent of any wrongdoing and even if they had no knowledge that the Debtor's investment program was a Ponzi scheme.

Accordingly, for the reasons set forth below, the Court will grant the motions for partial summary judgment as to the Trustee's prima facie case for each of the Defendants in this adversary proceeding. After entry of this order, the only issues remaining for trial will be any defenses raised by the Defendants.

### Procedural and Factual Background

This is an adversary proceeding arising out of the chapter 7 bankruptcy case of McCarn's Allstate Finance, Inc. ("Debtor" or "Allstate"). This Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. sections 157 and 1334, and 11 U.S.C. sections 544 and 548. This is a core proceeding under 28 U.S.C. section 157(b)(2)(A), (E) and (F).

This case came on for hearing on multiple motions for partial summary judgment brought by the Trustee for Allstate ("Trustee") against numerous Defendants. The Defendants were either brokerage companies or individual brokers who sold short-term promissory notes for the Debtor.

The Debtor's principal, James McCarn ("McCarn"), was the sole officer, shareholder, and director of two companies: Allstate and McCarn Enterprises, Inc. ("Enterprises"). McCarn incorporated Allstate ostensibly for the purpose of financing sub-prime automobile loans; he incorporated Enterprises as part of his auto loan business.

From mid–1994 through October 2002, McCarn, through the two companies, offered and sold millions of dollars worth of unregistered, unsecured promissory notes (collectively, the "Notes") to over 600 investors in several states (the "Investors"). Each Allstate Note was for a nine-month term and was represented to pay 9 percent interest on an annualized basis.

To solicit customers to purchase the Notes, McCarn used various selling agents ("Brokers") who he paid commissions upon the initial sale of each Note. When an Investor bought a nine-month Note from Allstate, the Investor paid the face value of the Note to Allstate. In return, the Investor received a Note issued by Allstate and signed by McCarn. Investors also received a Purchaser's Receipt (the "Receipt"), which contained the following notice: "Repurchase notices are sent one month prior to maturity. If Allstate Finance, Inc. does not hear from the purchaser by the maturity date, Allstate Finance, Inc. is authorized to continue the Promissory Note 'as is' " ("Notice").

As a result, the Notes generally automatically renewed in accordance with the terms of the Receipt thus avoiding the repayment of principal. Whenever a Note automatically renewed, Allstate generally paid an additional commission to the Broker who originally sold the Note, even though the Broker did not solicit the renewal. Investors had the option of receiving their interest monthly or, as many Investors chose, receiving their interest checks at the end of the nine-month term. McCarn, through Allstate, used the proceeds from the sale of Notes to new Investors to pay off interest and principal to earlier Investors.

By mid–2002, Allstate's scheme collapsed due to its inability to raise enough money to sustain and to perpetuate the

scheme. In July 2002, several Investors filed a petition for involuntary bankruptcy against Enterprises when the Investors failed to receive their interest payments. This Court entered an order for relief against Enterprises and appointed Andrea P. Bauman as Trustee in September 2002. One month later, Allstate filed a voluntary petition. On October 11, 2002, this Court entered an order converting Allstate's Chapter 11 case to one under chapter 7 of the Bankruptcy Code. Andrea P. Bauman has also been appointed the chapter 7 trustee in Allstate's Chapter 7 case.

Meanwhile, in September 2003, the United States Attorney for the Middle District of Florida filed a two-count Information ("Information") against McCarn alleging, among other things, that:

5. Beginning on an unknown date, but at least as early as in or about August 1995, and continuing thereafter, through and including October 7, 2002, within the Middle District of Florida, the District of Nevada, and elsewhere,

### JAMES HOYLE McCARN,

the defendant herein, did unlawfully, knowingly and willfully, combine, conspire, confederate and agree with other individuals, both known and unknown, to commit certain offenses against the United States, specifically:

a. To execute and attempt to execute a scheme to defraud and engage in acts and practices which operate as a fraud or deceit in connection with the purchase and sale of securities, utilizing the means and instrumentalities of interstate commerce and the United States mail; in violation of Title 15, United States Code, Section 78j(b); and

b. To execute and attempt to execute a scheme and artifice to defraud, and for obtaining money from invest-

ment customers by false and fraudulent pretenses, representations, and promises, utilizing the Unites States mail and private and commercial carriers, in violation of Title 18, United States Code, Section 1341.

.    .    .    .    .

12. It was a further part of the conspiracy that the defendant and coconspirators would and did omit to state in the brochures, bi-fold question and answer pamphlets, and other materials advertising investment opportunities in the nine-month promissory notes, the material fact that the investors' funds were utilized for purposes other than operations of MAF.

13. It was a further part of the conspiracy that the defendant and coconspirators would and did omit to state in the brochures, bi-fold question and answer pamphlets, and other materials advertising investment opportunities in the nine-month promissory notes, the material fact that investors' funds were used to pay for commissions, salaries, and personal expenses and to make loans to other entities controlled by defendant.

14. It was a further part of the conspiracy that the defendant and coconspirators would and did omit to state in the brochures, bi-fold question and answer pamphlets, and other materials advertising investment opportunities in the nine-month promissory notes, the material fact that investors' funds were used to make interest and principal payments on promissory notes previously issued to other investors.

On September 26, 2003, McCarn pleaded guilty to both counts of the Information.

After discovering the fraudulent nature of McCarn's business, the Trustee filed these adversary proceedings in October 2003 pursuant to sections 544, 548, and 550

of the Bankruptcy Code and chapter 726 of the Florida Statutes. The complaints, filed against both individual brokers and brokerage firms, seek to avoid what the Trustee alleges were actual and constructively fraudulent transfers in the form of commissions paid by the Debtor to the Defendants.

### Conclusions of Law

Ponzi schemes inevitably end up in bankruptcy court leaving behind numerous victims—many of whom invested their life savings in the scheme without any knowledge of its fraudulent nature. Although a chapter 7 trustee can often recover some of the fraudulently acquired funds from the assets of the debtor and the debtor's insiders, in most cases those assets fall woefully short of the victims' losses. This leads to adversary proceedings such as these that seek recovery against others, who, while innocent of any wrongdoing, were nevertheless involved in procuring the investors.

When the trustee brings an action against such third parties, a common theme runs through their responses—that is, they too were victims of the debtor's fraudulent conduct. Defendants filed similar responses in this case. For example, Defendant Robert Burchette writes, "I *could not* have known what was going on—the following did not know [naming, among others, the Department of Banking & Finance of the State of Florida] ... HOW COULD I HAVE KNOWN! All of the above did not have a clue—WHY ME!" Answer of Robert Burchette, Adv. Proc. No. 03–0568 (emphasis in original).

For the answer to Mr. Burchette's plea and similar pleas of the other Defendants, the Court must look to the language of the fraudulent conveyance statutes upon which the Trustee has based her case. Specifically, the Trustee alleges that the commissions Debtor paid to the Defendants constituted actual fraudulent transfers under Bankruptcy Code section 548(a)(1) and the state law fraudulent transfer statute, Florida Statutes section 726.105(1)(a). Under the Trustee's theory, once the Court concludes that the transfers made by McCarn's were part of a Ponzi scheme, then the Trustee may recover against the initial transferees of the transfers—in this case the brokers who received their commission checks—even if the brokers had no knowledge whatsoever of the fraudulent nature of the underlying venture.

### 1. Elements of the Trustee's Prima Facie Case

The elements of a case under Bankruptcy Code section 548 and Florida Statutes section 726.105(1)(a), are as follows:

a. The debtor must have transferred the property within one year (under section 548) or four years (under section 726.105) of filing of the bankruptcy petition. In this case, the involuntary bankruptcy petition was filed on October 7, 2002.

b. The transfer must have been made with the actual intent to hinder, delay, or defraud any entity to which the debtor was indebted. 11 U.S.C. § 548(a)(1); Fla. Stat. § 726.105(1)(a).

In addition, in order for the Trustee to use the provisions of the Florida fraudulent conveyance statute found in section 726.105(1)(a), with its more favorable four-year, look-back period, the Trustee must meet the condition found in Bankruptcy Code section 544(b) that there exist "at least one unsecured creditor of the Debtor who at the time the transfer in question occurred could have, under applicable local law, attacked and set aside the transfer under consideration." *In re Smith*, 120 B.R. 588, 590 (Bankr.M.D.Fla.

1990) (citations omitted). Under section 544(b), the Trustee "step[s] into the shoes of a creditor for the purpose of asserting causes of action under state fraudulent conveyance laws and confers on the trustee the status of a hypothetical creditor or bona fide purchaser as of the commencement of the case." *Matter of Zedda,* 103 F.3d 1195, 1201 (5th Cir.1997). *See also In re Kaufman Roberts, Inc.,* 188 B.R. 309, 313 (Bankr.S.D.Fla.1995).

There is no dispute in this case about the existence of unsecured creditors on the dates of the transfers involved in this adversary proceeding. Therefore, the Trustee has satisfied this burden. As discussed below, this was a Ponzi scheme in which numerous creditors were defrauded from its inception. Many of the over 800 creditors that filed claims in this case could have brought an action to recover funds fraudulently transferred by the Debtor under Florida Statutes section 726.105(1)(a). *See, e.g., Wilson v. Wilson,* No. 03–00780, 2004 WL 2671678, at *4 (Bankr.N.D.Iowa Nov.12, 2004) ("Eight creditors filed proofs of claim after receiving notice that assets exist for distribution. Thus, the record in the bankruptcy case is sufficient to prove the existence of a creditor holding an unsecured claim under § 544(b)."); *In re Imageset, Inc.,* 299 B.R. 709, 715 (Bankr.D.Me.2003) ("[the trustee] has submitted copies of proofs of claim filed by nine of those twenty-three creditors [and because the proof was not rebutted, summary judgment was entered on the existence of an unsecured creditor]."); *In re Int'l Loan Network, Inc.,* 160 B.R. 1, 18 (Bankr.D.D.C.1993) ("At least 15,000 proofs of claims (the vast majority being unsecured claims) have been filed against the ILN estate, some evidencing unsecured claims that arose as early as February 1989. Therefore the trustee has met his burden of establishing that at least one unsecured creditor exists [ ] who could bring a claim.").

**2. Proving Actual Fraud under Bankruptcy Code section 548(a)(1) and Florida Statutes section 726.105(1)(a)**

As an initial matter, Bankruptcy Code section 548 and Florida Statutes section 726.105 are substantially the same, and both address claims under the same legal framework. *See In re Toy King Distributors, Inc.,* 256 B.R. 1, 126–27, 143 (Bankr. M.D.Fla.2000) (treating § 726.105 as state law equivalent of 11 U.S.C. § 548(a)(1)(A) and treating § 726.106 as state law equivalent of § 548(a)(1)(B)); *In re Stewart,* 280 B.R. 268, 273 (Bankr.M.D.Fla.2001) (holding that § 548 and § 726.105 "are analogous 'in form and substance' and may be analyzed contemporaneously.") (citing *In re Venice–Oxford Assoc. Ltd,* 236 B.R. 820, 834 (Bankr.M.D.Fla.1999)); *In re Randy,* 189 B.R. 425, 443 (Bankr.N.D.Ill.1995) (finding that "[s]ince § 548 of the Bankruptcy Code and §§ 5 and 6(a) of UFTA are analogous, the findings regarding § 548(a)(1) and (a)(2) apply identically to the requirements of [the Uniform Fraudulent Transfer Act]" (citing Collier on Bankruptcy, ¶ 548.01 (15th Ed.1992)); *In re United Energy Corp.,* 944 F.2d 589, 594 (9th Cir.1991)). Therefore, the analysis of what must be shown to prove actual fraud under both the bankruptcy and state law fraudulent transfer provisions is the same.

"Actual fraud [under either statute] is seldom proven by direct evidence." *Toy King Distributors,* 256 B.R. at 127. Instead, it is usually "gleamed [sic] from inferences drawn from a course of conduct." *Id.* at 127–28 (quoting *In re F & C Servs., Inc.,* 44 B.R. 863, 872 (Bankr. S.D.Fla.1984)). "To determine whether circumstantial evidence supports an inference of intent," in most cases, courts look

to "badges of fraud." *Id.* at 128. The Eleventh Circuit has adopted the badges of fraud contained in the Florida fraudulent transfer statute. *In re Levine,* 134 F.3d 1046, 1053 (11th Cir.1998).[1]

■ However, while badges of fraud are often helpful, bankruptcy courts nationwide have recognized that establishing the existence of a Ponzi scheme is sufficient to prove a Debtor's actual intent to defraud. A Ponzi scheme is defined as follows:

> [A] fraudulent investment arrangement in which returns to investors are not obtained from any underlying business venture but are taken from monies received from new investors. Typically, investors are promised high rates of return, and initial investors obtain a greater amount of money from the ponzi scheme than those who join the ponzi scheme later. As a result of the absence of sufficient, or any, assets able to generate funds necessary to pay the promised returns, the success of such a scheme guarantees its demise because the operator must attract more and more funds, which thereby creates a greater need for funds to pay previous investors, all of which ultimately causes the scheme to collapse.

*In re Taubman,* 160 B.R. 964, 978 (Bankr. S.D.Ohio 1993) (citations omitted).

In *In re Independent Clearing House, Co.,* 77 B.R. 843 (D.Utah 1987), the District Court of Utah best explains why finding the existence of a Ponzi scheme establishes actual intent:

> A Ponzi scheme cannot work forever. The investor pool is a limited resource and will eventually run dry. The perpetrator must know that the scheme will eventually collapse as a result of the inability to attract new investors. The perpetrator nevertheless makes payments to present investors, which, by definition, are meant to attract new investors. He must know all along, from the very nature of his activities, that investors at the end of the line will lose their money. Knowledge to a substantial certainty constitutes intent in the eyes of the law, *cf. Restatement (Second) of Torts* § 8A (1963 & 1964), and a debtor's knowledge that future investors will not be paid is sufficient to establish his actual intent to defraud them.

*Id.* at 860. Multiple courts have reached the same conclusion. *See, e.g., Scholes v. Lehmann,* 56 F.3d 750, 757 (7th Cir.1995); *In re Agricultural Research and Tech. Group,* Inc., 916 F.2d 528, 535 (9th Cir. 1990); *Conroy v. Shott,* 9 Ohio Misc. 117, 363 F.2d 90, 92 (6th Cir.1966); *In re World Vision Entm't, Inc.,* 275 B.R. 641, 656 (Bankr.M.D.Fla.2002); *In re C.F. Foods, L.P.,* 280 B.R. 103, 111 (Bankr.E.D.Pa.

---

1. The badges include:
   (a) The transfer or obligation was to an insider.
   (b) The debtor retained possession or control of the property transferred after the transfer.
   (c) The transfer or obligation was disclosed or concealed.
   (d) Before the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit.
   (e) The transfer was of substantially all the debtor's assets.
   (f) The debtor absconded.
   (g) The debtor removed or concealed assets.
   (h) The value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred.
   (i) The debtor was insolvent or became insolvent shortly after the transfer was made or the obligation incurred.
   (j) The transfer occurred shortly before or shortly after a substantial debt was incurred.
   (k) The debtor transferred the essential assets of the business to a lienor who transferred the assets to an insider of the debtor.
   *Id.* (citing Fla. Stat. § 726.105(2)).

2002); *In re Armstrong*, 217 B.R. 569, 574 (Bankr.E.D.Ark.1998); *In re M & L Bus. Mach. Co., Inc.*, 198 B.R. 800, 806 (Bankr. D.Colo.1996); *In re Cohen*, 199 B.R. 709, 717 (9th Cir. BAP 1996); *In re Foos*, 188 B.R. 239, 244 (Bankr.N.D.Ill.1995); *Randy*, 189 B.R. at 439; *Taubman*, 160 B.R. at 983.

One way to establish the existence of a Ponzi scheme is through a guilty plea to an information or indictment that alleges facts sufficient to infer the existence of a Ponzi scheme. *See Scholes*, 56 F.3d at 762 (holding that debtor's plea agreement, admitting charges of fraud, established existence of Ponzi scheme); *In re Mark Benskin & Co., Inc.*, 161 B.R. 644, 648–49 (Bankr.W.D.Tenn.1993) (noting as part of finding that guilty pleas prove by preponderance of the evidence actual intent to defraud that the indictment "clearly allege[d] a scheme ... to defraud creditors ... by pleading guilty the debtors admitted, among other things, misappropriation of customers' [ ] funds and misrepresentation of the status of or return on their investments.").

Even if the information or indictment did not specifically label the fraud a "Ponzi scheme," if the allegations in the information establish that the debtor ran a scheme whereby the debtor intended to defraud the debtor's creditors, evidence of a guilty verdict or plea agreement admitting the charges can establish the existence of a Ponzi scheme. *See In re Ramirez Rodriguez*, 209 B.R. 424, 433 (Bankr.S.D.Tex.1997) (holding that debtor's criminal conviction based on the operation of a Ponzi scheme conclusively established fraudulent intent); *Randy*, 189 B.R. at 439 (same); *Benskin & Co.*, 161 B.R. at 648 (same). *See al so C.F. Foods*, 280 B.R. at 111 (citing generally to both ideas with approval).

The Information entered against McCarn alleges that McCarn committed acts commensurate with the definition of a Ponzi scheme. The Information alleges that McCarn "execute[d] and attempt[ed] to execute a scheme to defraud and engage in acts and practices which operate as a fraud or deceit in connection with the purchase and sale of securities...." Information at ¶ 5(a). Additionally, the Information alleges that McCarn executed his fraudulent scheme by "obtaining money from investment customers by false and fraudulent pretenses, representations, and promises...." *Id.* at ¶ 5(b). More specifically, the Information alleges that McCarn sold securities to investors without telling the investors that their money was being "used to pay for commissions, salaries, and personal expenses and to make loans to other entities controlled by [McCarn]." *Id.* at ¶ 13. The Information also alleges that the "investors' funds were used to make interest and principal payments on promissory notes previously issued to other investors." *Id.* at ¶ 14.

These allegations are sufficient to establish the existence of a Ponzi scheme. Because McCarn (as sole shareholder, officer, and director of Allstate) admitted and pleaded guilty to all the allegations in the Information, he has admitted to creating and running a Ponzi scheme. As the case law above recognizes, a debtor who runs a Ponzi scheme knows that his future investors will lose their money and "a debtor's knowledge that future investors will not be paid is sufficient to establish his actual intent to defraud them." *Independent Clearing House*, 77 B.R. at 860. Therefore, the Trustee has established the Debtor's actual intent to defraud under Bankruptcy Code section 548(a)(1)(A) and Florida Statutes section 726.105(1)(a).

Once it is established that the Investors' funds were transferred by Debtor as part

of a Ponzi scheme, the Trustee has met her burden with respect to avoiding those transfers so long as they were made within either the one-year or the four-year, look-back periods contained in Bankruptcy Code section 548 or Florida Statutes section 726.105, respectively. In this case, no defendant has disputed that the transfers that the Trustee is seeking to avoid took place within the applicable look-back periods.

Thus, the Trustee has proven that the transfers were made within the applicable look-back period from the date of the Debtor's bankruptcy filing and that the transfers were made with actual intent to hinder, defraud, or delay creditors. The transfers, as listed in the motions for summary judgment, are therefore subject to avoidance under Bankruptcy Code section 548 and Florida Statutes section 726.105.

### 3. Defendants' Liability as Initial Transferees under 11 U.S.C § 550(a)

Once a court determines that transfers are avoidable under Bankruptcy Code section 548 or under Florida Statutes section 726.105, (available to the Trustee under Bankruptcy Code section 544(b)), the Court must then look to Bankruptcy Code section 550 to determine the liability of the transferee of the avoided transfer. In this regard, section 550 provides that "to the extent that a transfer is avoided under section 544[or] . . . 548, the trustee may recover, for the benefit of the estate, the property transferred, or, if the court so orders, the value of such property, from . . . the initial transferee of such transfer. . . ." 11 U.S.C. § 550(a)(1).

The Trustee does not dispute the Defendants' assertions that they were completely innocent of any wrongdoing and that they had no knowledge of the fraudulent nature of the Debtor's Ponzi scheme. Un-

fortunately for these Defendants, "[n]either innocence in action nor unfairness in result is a defense." *In re Mainely Payroll, Inc.*, 233 B.R. 591, 597 (Bankr.D.Me. 1999). "The statute leaves no room to fashion a remedy that treats the initial transferee equitably under the circumstances of any given case." *Id.* at fn. 7 (citing *Bowers v. Atlanta Motor Speedway, Inc. (In re Southeast Hotel Properties Ltd.)*, 99 F.3d 151, 157 (4th Cir.1996) ( [D]ecisions as to who should bear the loss incurred by a post-petition transfer are made in the Code.); *Rupp v. Markgraf*, 95 F.3d 936, 944 (10th Cir.1996) (Congress has made its own judgment of who should bear the risk of loss under [sic] these situations when it enacted Section 550, and [the court is] bound to accept that judgment.); *Bonded Fin. Servs., Inc. v. European Am. Bank*, 838 F.2d 890, 894–95 (7th Cir.1988) (rejecting an approach that would treat any entity that handles the debtor's assets as an initial transferee and then bail out the deserving through an unwarranted extension of equity); *Richardson v. F.D.I.C. (In re M. Blackburn Mitchell Inc.)*, 164 B.R. 117, 123 (Bankr. N.D.Cal.1994) ( [T]he Court declines to manipulate the application of the Code [550] in order to achieve what some may contend is a preferred result.); *Id.* at 125 (The Court concludes that it is irrelevant as a matter of law that the [defendant] did not have knowledge, or reason to believe, that the funds it received flowed from Debtor's account. Under 550 of the Bankruptcy Code, it is crystal clear that even the "innocent" initial transferee is liable for the fraudulently transferred funds.); *see also In re Finley*, 130 F.3d 52, 56 (2d Cir.1997) (describing practice of some courts that regard the first pair of hands to touch the property [as] the initial transferee, and then go on to separate sheep from goats in an attempt to work equity); *see generally* Kenneth P. Coleman, *Con-*

*duits, Good Faith, and the Recovery of Preferences and Fraudulent Transfers Under Bankruptcy Code Section 550,* 114 Banking L.J. 375 (1997) (analyzing Rupp)).

■■ The Court concludes, therefore, that it is irrelevant as a matter of law that the Defendants did not have knowledge of the Ponzi scheme. That is, under section 550, "it is crystal clear that even the 'innocent' initial transferee is liable for the fraudulently transferred funds." *M. Blackburn Mitchell,* 164 B.R. at 125.

No Defendant has disputed the Trustee's allegation that he or she was an initial transferee. Thus, the Trustee has successfully proven that the Defendants were initial transferees within the meaning of section 550(a).

### Conclusion

Through a series of motions for partial summary judgment, the Trustee has proven all the necessary elements to avoid the transfers by the Debtor to the Defendants under Bankruptcy Code section 548 and under Bankruptcy Code section 544(b) via Florida Statutes section 726.105(1)(a). Specifically:

(a) The Trustee has proven that the Debtor made transfers to the Defendants listed in the respective motions for summary judgment and that the Defendants were the initial transferees within the meaning of 11 U.S.C. § 550(a)(1);

(b) The Trustee has proven that the transfers set forth in the motions for summary judgment were made within one year (for purposes of Bankruptcy Code section 548) or four years (for purposes of Florida Statutes section 726.105(1)(a)) before the date of the filing of the petition;

(c) The Trustee has proven that the transfers were made with actual intent to hinder, delay, or defraud the Debtor's creditors; and

(d) In satisfaction of Bankruptcy Code section 544(b) for purposes of utilizing Florida Statutes section 726.105(1)(a), the Trustee has proven the existence of at least one unsecured creditor who could have brought these claims.

Thus, the Trustee has proven all the elements necessary to establish that the transfers listed in the motions for summary judgment are avoidable as fraudulent under Bankruptcy Code section 548 or Florida Statutes section 726.105. The amounts transferred are therefore recoverable for the benefit of the Estate in accordance with Bankruptcy Code section 550. The only issues remaining for trial are any defenses the Defendants might raise.

The Court will enter separate orders granting the motions for summary judgment in each of these adversary proceedings.

DONE and ORDERED in Tampa, Florida, this 30th day of June, 2005.