**In re DEALERS AGENCY SERVICES, INC., Debtor.**

**Douglas N. Menchise, Trustee, Plaintiff,**

v.

**Terry S. Clark, Ellen Deane, and DAS 2, LLC, Defendants.**

**Bankruptcy No. 8:01–bk–17391–PMG.**
**Adversary No. 8:03–ap–310–PMG.**

United States Bankruptcy Court,
M.D. Florida,
Tampa Division.

March 30, 2007.

610

John P. Holsonback, Lee Harang, Fuller Holsonback Bivins & Malloy, Joseph E. Launikitis, Tampa, FL, for Plaintiff.

Barbara C. Leon, Buddy D. Ford, PA, Buddy D. Ford, Tampa, FL, for Defendants.

## FINDINGS OF FACT, CONCLUSIONS OF LAW, AND MEMORANDUM OPINION

PAUL M. GLENN, Chief Judge.

**THIS CASE** came before the Court for a final evidentiary hearing in the above-captioned adversary proceeding.

The Plaintiff, Douglas N. Menchise, as Chapter 7 Trustee, commenced this adversary proceeding by filing a Complaint to avoid the transfer of substantially all of the assets of the Debtor, Dealers Agency Services, Inc., to a limited liability company known as DAS 2, LLC, within one year before the filing of the Debtor's bankruptcy petition. The issue in this case is whether the transfer was a fraudulent transfer within the meaning of § 548 of the Bankruptcy Code and § 726.105 of the Florida Statutes, or a preferential transfer within the meaning of § 547 of the Bankruptcy Code.

## Background

The Debtor was incorporated on September 8, 1998. Its initial officers and directors were Larry O'Blander (O'Blander) and Ellen Deane (Deane). (Plaintiff's Exhibit 6). O'Blander was the Debtor's sole shareholder.

The Debtor was a specialty insurance agency that was primarily engaged in the business of providing certain insurance and bonding services, known as garage liability, to automobile dealerships.

Terry Clark (Clark) became employed by the Debtor in 1998, initially as the property and casualty manager. He later signed certain documents as the Debtor's Vice President. (Transcript, Vol. I, p. 86).

In 1999, Sandra Phillips filed a lawsuit against the Debtor and O'Blander in the Circuit Court for Hillsborough County, Florida, Case No. 99–7963. (Transcript, Vol. I, p. 76; Plaintiff's Exhibit 4). In the action, Sandra Phillips sought to recover certain commissions that were owed to her deceased husband pursuant to a Commission Agreement that had been entered by her husband and the Debtor. (Plaintiff's Exhibit 3).

On April 2, 2001, while Sandra Phillips' lawsuit remained pending, O'Blander and an entity known as DAS 2, LLC entered into an Assets and Liabilities Purchase Agreement (the Agreement), pursuant to which O'Blander, as the owner of all of the Debtor's stock, sold "all of the assets and certain of the liabilities" of the Debtor to DAS 2, LLC. (Plaintiff's Exhibit 10).

Specifically, the Agreement stated that it was entered "by and between DAS 2, LLC, a limited liability company in formation, owned by The Deane/Clark Trust (which is owned by Ellen L. Deane and Terry S. Clark), hereinafter referred to as 'purchasers' or 'buyers', and Larry A. O'Blander, an individual, hereinafter referred to as 'seller' or 'LAO'."

The assets that were the subject of the sale were listed on Exhibit A to the Agreement. The liabilities that were assumed by DAS 2, LLC were listed on Exhibit B to the Agreement. The liabilities included a debt owed to North American Specialty Insurance Company in the amount of $50,599.40, and a debt owed to RLI Insurance Company in the amount of $45,826.20.

The Agreement was signed by O'Blander as the Seller, by Clark as president of DAS 2, LLC, and by Deane as vice president, secretary, and treasurer of DAS 2, LLC.

A separate Bill of Sale was also executed by O'Blander and Clark on April 2, 2001. (Plaintiff's Exhibit 12).

On April 9, 2001, O'Blander, Deane, and Clark executed an Addendum to the Agreement, which provided that Deane and Clark also assumed all of O'Blander's legal and accounting expenses, in addition to the other liabilities listed in the Agreement. (Plaintiff's Exhibit 11).

On April 16, 2001, approximately one week after the Agreement was entered, DAS 2, LLC, was formed as a limited liability company under the laws of the state of Delaware. (Plaintiff's Exhibit 8).

On June 20, 2001, DAS 2, LLC was authorized to transact business in the state of Florida. (Plaintiff's Exhibit 9).

On September 18, 2001, the Debtor filed a petition under Chapter 7 of the Bankruptcy Code. The "sale of assets/certain liabilities of Dealers Agency Services, Inc." to DAS 2, LLC in April of 2001 was disclosed on the Debtor's Statement of Financial Affairs.

On May 27, 2003, the Trustee in the Debtor's Chapter 7 case filed a Complaint against Clark, Deane, and DAS 2, LLC

(collectively, the Defendants). In the Complaint, the Trustee seeks to avoid the transfer of the Debtor's assets to the Defendants as a fraudulent transfer pursuant to § 548 of the Bankruptcy Code and § 726.105 of the Florida Statutes, or a preferential transfer pursuant to § 547 of the Bankruptcy Code.

## Discussion

The subject of this adversary proceeding is the transfer of virtually all of the Debtor's assets to DAS 2 pursuant to the Assets and Liabilities Purchase Agreement dated April 2, 2001. In Count I and Count III of the Complaint, the Plaintiff asserts that the transfer should be avoided because it was made with the actual intent to hinder, delay, or defraud the Debtor's creditors. In Count II and Count IV of the Complaint, the Plaintiff asserts that the transfer should be avoided because the Debtor received less than a reasonably equivalent value in exchange for the transfer.

■ The Plaintiff bears the burden of proving that the transfer was fraudulent under both theories of action. *In re Ramsurat*, 361 B.R. 246, 252 (Bankr.M.D.Fla. 2006).

## I. Actual intent to hinder, delay, or defraud

Count I of the Complaint is based on § 548(a)(1)(A) of the Bankruptcy Code. As applicable to this case, that section provided:

**11 USC § 548. Fraudulent transfers and obligations**

(a)(1) The trustee may avoid any transfer of an interest of the debtor in property, or any obligation incurred by the debtor, that was made or incurred on or within one year before the date of the filing of the petition, if the debtor voluntarily or involuntarily—

(A) made such transfer or incurred such obligation *with actual intent to hinder, delay, or defraud* any entity to which the debtor was or became, on or after the date that such transfer was made or such obligation was incurred, indebted.

11 U.S.C. § 548(a)(1)(A)(Emphasis supplied).

Count III of the Complaint is based on § 726.105(1)(a) of the Florida Statutes. That section provides:

**726.105. Transfers fraudulent as to present and future creditors**

(1) A transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation:

(a) *With actual intent to hinder, delay, or defraud any creditor* of the debtor.

Fla. Stat. 726.105(1)(a)(Emphasis supplied).

Section 548 of the Bankruptcy Code and § 726.105 of the Florida Statutes are substantially the same, with the result that "the analysis of what must be shown to prove actual fraud under both the bankruptcy and state law fraudulent transfer provisions is the same." *In re McCarn's Allstate Finance, Inc.*, 326 B.R. 843, 849 (Bankr.M.D.Fla.2005).

To establish a cause of action under § 548(a)(1)(A) and § 726.105(1)(a), the Plaintiff must show (1) that the Debtor transferred property within one year (under § 548) or four years (under § 726.105) of filing the bankruptcy petition, and (2) that the transfer was made with the actual intent to hinder, delay, or defraud any entity to which the debtor was indebted.

*In re McCarn's Allstate Finance*, 326 B.R. at 848.

In this case, it is undisputed that the Debtor's assets were sold to DAS 2 on April 2, 2001. The Debtor's bankruptcy petition was filed on September 18, 2001. Consequently, the transfer occurred within the time periods set forth in the respective statutes.

The primary issue in this case, therefore, involves the second element of the cause of action under § 548(a)(1)(A) and § 726.105(1)(a): whether the transfer was made with the actual intent to hinder, delay, or defraud a creditor of the Debtor.

■ "Because it is difficult to establish a transferor's actual intent, courts generally consider the totality of the circumstances and determine whether any 'badges of fraud' are present in connection with a particular transfer." *In re Ramsurat*, at 253. "The Eleventh Circuit has adopted the badges of fraud contained in the Florida fraudulent transfer statute." *In re McCarn's Allstate Finance*, 326 B.R. at 850(citing *In re Levine*, 134 F.3d 1046, 1053 (11th Cir.1998)).

■ The "badges of fraud" as set forth in § 726.105 are as follows:

**726.105. Transfers fraudulent as to present and future creditors**

. . .

(2) In determining actual intent under paragraph (1)(a), consideration may be given, among other factors, to whether:

(a) The transfer or obligation was to an insider.

(b) The debtor retained possession or control of the property transferred after the transfer.

(c) The transfer or obligation was disclosed or concealed.

(d) Before the transfer was made or the obligation was incurred, the debtor had been sued or threatened with suit.

(e) The transfer was of substantially all of the debtor's assets.

(f) The debtor absconded.

(g) The debtor removed or concealed assets.

(h) The value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred.

(i) The debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred.

(j) The transfer occurred shortly before or shortly after a substantial debt was incurred.

(k) The debtor transferred the essential assets of the business to a lienor who transferred the assets to an insider of the debtor.

Fla. Stat. 726.105(2). "While a single badge of fraud may create only a suspicious circumstance, several of them together may afford a basis to infer fraud." *In re PSI Industries, Inc.*, 306 B.R. 377, 387 (Bankr.S.D.Fla.2003)(citing *In re World Vision Entertainment, Inc.*, 275 B.R. 641 (Bankr.M.D.Fla.2002)).

■ In this case, the Court finds that the transfer of the Debtor's assets to DAS 2 on April 2, 2001, was made with the actual intent to hinder, delay, or defraud the Debtor's creditors within the meaning of § 548(a)(1)(A) of the Bankruptcy Code and § 726.105(1)(a) of the Florida Statutes. The factors upon which the Court relies to support this decision are discussed below.

**A. Whether the transfer was to an insider**

Pursuant to the Assets and Liabilities Purchase Agreement, all of the assets of

the Debtor, Dealers Agency Services, Inc., were sold to DAS 2, LLC.

Ellen Deane was a director of the Debtor before the sale of its assets to DAS 2. (Plaintiff's Exhibit 6). Ellen Deane was also an officer of the Debtor before the sale of its assets to DAS 2. (Plaintiff's Exhibit 7). Finally, Ellen Deane was Larry O'Blander's girlfriend at the time of the transfer, and is now Larry O'Blander's wife. (Transcript, Vol. II, pp. 134–35). Larry O'Blander was the sole shareholder of the Debtor.

Ellen Deane was an insider of the Debtor/transferor.

Ellen Deane is also the person in control of the transferee, DAS 2. Both Terry Clark and Larry O'Blander testified repeatedly that Ellen Deane owns fifty-one percent of DAS 2. Terry Clark, for example, testified as follows:

Q: So who owns DAS 2?

A: Ellen Deane and myself.

Q: Okay. And how is that broken up percentage-wise?

A: Ellen Deane owns 51 percent, I own 49 percent.

(Transcript, Vol. I, p. 99)(See also Transcript, Vol. I, pp. 103, 172). Similarly, Larry O'Blander testified that Ellen Deane, his wife, has a "51 percent ownership interest" in DAS 2. (Transcript, Vol. II, p. 143). Ellen Deane did not testify at trial, but disclosed her interest in DAS 2 on the Statement of Financial Affairs filed in her individual bankruptcy case in 2005. (Plaintiff's Exhibit 27).

Additionally, Terry Clark was the manager and arguably an officer of the Debtor/transferor before the transfer. (Transcript, Vol. I, p. 86). He is also the President and forty-nine percent owner of the transferee, DAS 2. (Plaintiff's Exhibit 10).

Finally, although the Assets and Liabilities Purchase Agreement refers to the Deane/Clark Trust as the owner of DAS 2, no documents other than a Certificate of Trust were admitted into evidence to establish the existence or operation of the Trust, and it does not appear that the Trust ever obtained a tax identification number or filed tax returns. (Defendants' Exhibits 5 and 28; Transcript, Vol. II, pp. 194, 198). In fact, Terry Clark, who was described as a Trustee of the Trust, testified that he did not believe that any trust documents existed or were ever created. (Transcript, Vol. I, pp. 103, 113).

The Debtor's assets were transferred to insiders of the Debtor, Ellen Deane and Terry Clark.

## B. Whether the Debtor retained possession or control

Larry O'Blander was the sole owner of the Debtor. (Plaintiff's Exhibit 10; Transcript, Vol. I, p. 90).

As shown above, all of the Debtor's assets were transferred to DAS 2, which is controlled by Ellen Deane, who was Larry O'Blander's girlfriend at the time of the sale and is now his wife.

Although DAS 2 "hired" O'Blander following the sale (Transcript, Vol. I, p. 138), it is undisputed that he performed only minimal services for the new company. Terry Clark testified, for example, that O'Blander did "very little work" for DAS 2 in 2001, that O'Blander was "pretty much disengaged from the agency" after the sale, and that O'Blander "had moved on to other things trying to make a living in other ways." Specifically, after the sale, O'Blander devoted his time to "running a boat moving business called Marine Movers." (Transcript, Vol. I, p. 184).

Further, O'Blander conceded that he did not work much for DAS 2 after the sale,

because he "was done in the insurance business," and was trying to become a boat transport broker. (Transcript, Vol. II, pp. 124–25). O'Blander acknowledged, for example, that he only "pitched in" from time to time after the sale, performing such tasks as answering the phone or getting the mail for DAS 2. (Transcript, Vol. II, p. 125).

Despite O'Blander's limited role in the operation of the agency after the sale, and despite the apparent absence of any written agreement with DAS 2, O'Blander individually received a salary and other funds from DAS 2 in the total amount of $163,846.67 between 2001 and 2006. Additionally, Ellen Deane, his wife, individually received a salary and other funds from DAS 2 in the amount of $202,980.53 during the same period. In combination, O'Blander and Deane received salaries and other benefits from DAS 2 in the total amount of $574,953.58 between 2001 and 2006, excluding their automobile expenses. (Plaintiff's Exhibit 25; Transcript, Vol. II, p. 171).

Specifically, in addition to his salary of $1,000.00 per month, the benefits received by Larry O'Blander individually from DAS 2 include health and dental insurance, disability insurance, life insurance, automobile insurance, and automobile installment payments. (Transcript, Vol. I, pp. 148–55 and Vol. II, p. 125; Plaintiff's Exhibits 15, 16, 17, and 18).

Further, DAS 2 pays a portion of the rent for the personal residence of Larry O'Blander and Ellen Deane in Tavernier, Florida. (Transcript, Vol. I, p. 156).

Finally, DAS 2 furnishes Larry O'Blander with a credit card which he uses to travel between his two residences, among other charges. The credit card is issued to "Larry A. O'Blander, Dealers Insurance Services." Based on the statements that were admitted into evidence, it appears that Larry O'Blander has incurred substantial charges on the card for items such as restaurant bills, motel bills, and out-of-state travel expenses. (Transcript, Vol. I, pp. 156–57, 161–68; Plaintiff's Exhibit 19). The charges were paid by DAS 2. (Transcript, Vol. I, pp. 163–64).

In short, Larry O'Blander is not an officer or owner of DAS 2, and does not possess formal control of the company. His wife does control DAS 2, and it is clear that an arrangement exists pursuant to which O'Blander receives valuable benefits from DAS 2 that are not commensurate with his limited services to the company.

### C. Whether the transfer was disclosed

The Debtor's assets were transferred to DAS 2, LLC. DAS 2 was formed as a Delaware corporation. (Plaintiff's Exhibit 8).

Following the sale of the Debtor's assets to DAS 2, DAS 2 kept the Debtor's physical location and office space, the Debtor's fictitious name, the Debtor's signage, the Debtor's telephone number, the Debtor's fax line, and the Debtor's staff. (Transcript, Vol. I, pp. 93–95; Vol. II, pp. 166–67). There were no external indications that the agency operating at the Debtor's location was a new entity and not the Debtor.

Additionally, DAS 2 did not notify its clients that a new agency was servicing their accounts. (Transcript, Vol. I, pp. 95–96; Vol. II, pp. 166–67).

Finally, neither the Debtor nor DAS 2 notified Sandra Phillips of the transfer, even though Sandra Phillips' lawsuit had been pending against the Debtor and Larry O'Blander for approximately two years by the time that the sale occurred. (Transcript, Vol. I, pp. 79–80).

The transfer was not disclosed to all of the Debtor's creditors, or to its existing or potential clients.

### D. Whether the Debtor had been sued

In 1999, Sandra Phillips filed a lawsuit against the Debtor and Larry O'Blander in the Circuit Court for Hillsborough County, Florida, Case No. 99–7963. (Transcript, Vol. I, p. 76). In the action, Sandra Phillips sought to recover certain commissions that were owed to her deceased husband. The lawsuit remained pending at the time of the transfer, and was moving toward a trial date in October of 2001. (Plaintiff's Exhibit 4).

Sandra Phillips has filed a Proof of Claim in the Debtor's Chapter 7 case in the amount of $804,175.00. (Claim Number 9).

### E. Whether the Debtor transferred substantially all of its assets

It is undisputed that the Debtor sold virtually all of its assets to DAS 2. The Assets and Liabilities Purchase Agreement provided that "the Buyers are purchasing and acquiring from LAO, and LAO is selling and transferring to the Buyers, *all of the assets* and certain of the liabilities, as listed on Exhibits A and B, in consideration of the buyers' best efforts to help meet the obligations of the Company." (Plaintiff's Exhibit 10)(Emphasis supplied).

Pursuant to the Agreement, DAS 2 received all of the physical assets and the book of business of the Debtor. (Transcript, Vol. I, pp. 120–21). After the transfer, the Debtor was essentially a "closed shop." (Transcript, Vol. II, p. 166).

### F. Whether the Debtor was insolvent after the transfer

As set forth above, the Debtor sold substantially all of its assets, but only certain of its liabilities, to DAS 2 in April of 2001.

The Debtor filed a petition under Chapter 7 of the Bankruptcy Code approximately five months after the sale, on September 18, 2001. (Plaintiff's Exhibit 2).

The Debtor did not own any real property. On its Amended Schedule of Assets filed in the bankruptcy case, the Debtor also claimed that it did not own any personal property as of the petition date.

The Debtor retained significant liabilities after the transfer to DAS 2, however. On its Schedule of creditors filed in the bankruptcy case, the Debtor listed creditors holding unsecured claims in the total amount of $372,771.53. (Plaintiff's Exhibit 2). The claims include a claim asserted by Albert S. Klopf in the amount of $140,000.00, various claims for credit card purchases, and at least one claim based on a credit line.

The Trustee of the Chapter 7 estate testified that the Debtor became insolvent as a result of the transfer to DAS 2. (Transcript, Vol. I, p. 62).

### G. Whether the Debtor received reasonably equivalent value

According to the Assets and Liabilities Purchase Agreement, the Debtor sold the assets listed on Exhibit A to the Agreement to DAS 2, and DAS 2 assumed the liabilities listed on Exhibit B to the Agreement.

A total value of $55,795.37 was attributed to the assets listed on Exhibit A, which included cash and accounts receivable as well as furniture, fixtures, and equipment. A Bill of Sale executed on the same day as the Agreement contains two separate lists of machinery, equipment, furniture, and fixtures. (Plaintiff's Exhibit 12).

Further, in addition to the physical assets, the testimony at trial indicates that the Debtor's book of business was also sold to DAS 2 in conjunction with the transfer. (Transcript, Vol. I, p. 121). The parties appear to agree, for example, that the Debtor's "client, customer and sales records" were delivered to DAS 2 pursuant to the Agreement. (Plaintiff's Exhibit 10, ¶ 1.2).

On the other hand, the liabilities assumed by DAS 2 in connection with the sale, as listed in Exhibit B to the Agreement, equaled the total sum of $162,523.66. The liabilities listed on Exhibit B, however, do not represent all of the liabilities of the Debtor. Instead, Terry Clark acknowledged that the only liabilities assumed by DAS 2 were those that were considered necessary for the continued operation of the business. (Transcript, Vol. I, pp. 121–22).

Additionally, an Addendum to the Agreement signed on April 9, 2001, provides that the purchasers also agreed to assume the liabilities "for all legal and accounting fees" incurred by Larry O'Blander and the Debtor. (Plaintiff's Exhibit 11). At trial, however, O'Blander testified that he did not specifically know of any legal fees that were assumed pursuant to the Addendum. (Transcript, Vol. II, p. 136).

Based on the record, the Court cannot determine whether the Debtor received "reasonably equivalent value" in exchange for the transfer of its assets.

A primary difficulty, for example, is the valuation of the Debtor's book of business. The valuation is affected by numerous factors, such as the fact that the Debtor did not have enforceable noncompete agreements with its key producers, and the fact that the Debtor operated a "niche agency" that was vulnerable to changes in the industry. In fact, three expert witnesses testified at trial regarding the value of the agency, and their opinions as to its value ranged from "nominal" to more than $470,000.00.

For purposes of determining "actual intent" under the fraudulent transfer statutes, however, it is significant that the buyer, DAS 2, was formed with virtually no capital, and therefore had no independent means with which to fund the purchase price or pay the liabilities that it had assumed. Terry Clark testified, for example, that the only funds that were contributed to DAS 2 were the costs necessary to form the company. DAS 2 was "not substantially capitalized." (Transcript, Vol. I, pp. 122–23).

Further, for purposes of determining "actual intent," it is also significant that DAS 2 did not promptly pay the two largest liabilities that it had assumed under the Agreement. Specifically, pursuant to Exhibit B of the Agreement, DAS 2 assumed a liability to North American Specialty Insurance in the amount of $50,599.40, and a liability to RLI Insurance Company in the amount of $45,826.20. The liabilities are based on premiums that the Debtor collected from its clients, but did not pay over to the carriers.

In August of 2003, however, more than two years after the sale of the Debtor's assets, DAS 2 entered into a Stipulation to Withhold Entry of Judgment with North American Specialty Insurance. (Plaintiff's Exhibit 14). The Stipulation was signed in connection with a state court lawsuit that was commenced by NASI to collect the debt that had been assumed by DAS 2. Pursuant to the Stipulation, DAS 2 agreed that it owed NASI the sum of $81,751.30, to be paid in accordance with a schedule set forth in the agreement.

Additionally, in June of 2002, more than one year after the sale of the Debtor's

assets, Larry O'Blander and DAS 2 entered into a Settlement Agreement with RLI Insurance Company. (Plaintiff's Exhibit 13). The Settlement Agreement was entered in connection with litigation commenced by RLI in O'Blander's individual Chapter 7 case to collect the premiums that had not been paid by the Debtor or DAS 2. Pursuant to the Agreement, DAS 2 agreed to pay RLI the sum of $48,516.05 over a period of twelve months.

Based on the record, the Court cannot determine whether the value received by the Debtor in connection with the sale was "reasonably equivalent" to the value of the assets that it transferred.

It is clear from the record, however, that the Debtor did not receive the consideration contemplated by the Purchase Agreement, since the purchaser had no capital with which to pay the liabilities that it had assumed, and since two primary liabilities were not paid until the creditors initiated litigation to collect the debts.

■ The failure of the Debtor to receive the agreed consideration is an important factor in the Court's determination that the transfer was made with the actual intent to hinder, delay, or defraud the Debtor's creditors.

### H. Summary

The Court has considered the totality of the circumstances, including the factors discussed above, and finds that the Debtor transferred its assets to DAS 2 with the actual intent to hinder, delay or defraud its creditors.

The transfer was made to an insider, the Debtor's sole owner receives benefits from the purchaser that are not commensurate with his services, the transfer was not disclosed to the Debtor's creditors and the public, the transfer occurred while a lawsuit was pending against the Debtor, the transfer involved substantially all of the Debtor's assets and resulted in the Debtor's insolvency, and the Debtor did not receive the consideration contemplated by the Purchase Agreement.

Under these circumstances, the Court finds that the transfer was effectuated for the specific purpose of preventing certain of the Debtor's creditors from collecting their debts, and is avoidable under § 548(a)(1)(A) of the Bankruptcy Code and § 726.105(1)(a) of the Florida Statutes.

### I. The individual Defendants

■ The Court further finds, however, that DAS 2 was the transferee of the Debtor's assets, and that only the transfer to the Defendant, DAS 2, LLC, should be avoided.

The evidence indicates that the individual Defendants, Ellen Deane and Terry Clark, were responsible for developing and maintaining the agency's essential relationships with its key clients, and generated most of DAS 2's revenue after the sale. Clark, for example, handled the daily aspects of DAS 2's operations, and also serviced the insured's accounts for DAS 2. (Transcript, Vol. I, pp. 93, 96). Deane attracted and established the agency's bond business, and worked to sustain those client relationships following the transfer. (Transcript, Vol. II, pp. 183–84).

Although the individual Defendants, Terry S. Clark and Ellen Deane, received salaries and other compensation for their services to DAS 2 after the transfer, the Plaintiff did not establish that the individual Defendants directly or indirectly received any of the Debtor's property in excess of their earned compensation.

### II. Constructive fraud

Count II of the Complaint is based on § 548(a)(1)(B) of the Bankruptcy Code. As

applicable to this case, that section provided:

### 11 USC § 548. Fraudulent transfers and obligations

(a)(1) The trustee may avoid any transfer of an interest of the debtor in property, or any obligation incurred by the debtor, that was made or incurred on or within one year before the date of the filing of the petition, if the debtor voluntarily or involuntarily—

. . .

(B)(i) *received less than a reasonably equivalent value in exchange for such transfer* or obligation; and

(ii)(I) was insolvent on the date that such transfer was made or such obligation was incurred, or became insolvent as a result of such transfer or obligation;

(II) was engaged in business or a transaction, or was about to engage in business or a transaction, for which any property remaining with the debtor was an unreasonably small capital; or

(III) intended to incur, or believed that the debtor would incur, debts that would be beyond the debtor's ability to pay as such debts matured.

11 U.S.C. § 548(a)(1)(B)(Emphasis supplied).

Count IV of the Complaint is based on § 726.105(1)(b) of the Florida Statutes. That section provides:

### 726.105. Transfers fraudulent as to present and future creditors

(1) A transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation:

. . .

(b) *Without receiving a reasonably equivalent value in exchange for the transfer* or obligation, and the debtor:

1. Was engaged or was about to engage in a business or transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction; or

2. Intended to incur, or believed or reasonably should have believed that he or she would incur, debts beyond his or her ability to pay as they became due.

Fla. Stat. 726.105(1)(b)(Emphasis supplied).

"Under § 548(a)(1)(B) and Fla. Stat. § 726.105(1)(b), the plaintiff must prove that the debtors did not receive 'reasonably equivalent value' in exchange for the transferred property." *In re Seaway International Transport, Inc.*, 341 B.R. 333, 334 (Bankr.S.D.Fla.2006).

■ The statutes do not specifically define the term "reasonably equivalent value." In determining the issue, however, courts generally consider many factors, including the "good faith of the parties, the disparity between the fair value of the property and what the debtor actually received, and whether the transaction was at arm's length." *In re Vilsack*, 356 B.R. 546, 553 (Bankr.S.D.Fla.2006).

■ The "essential examination is a comparison of 'what went out' with 'what was received.'" *In re Leneve*, 341 B.R. 53, 57 (Bankr.S.D.Fla.2006)(citing *In re Grabill Corp.*, 121 B.R. 983, 994 (Bankr.N.D.Ill.1990)).

■ In this case, the Court cannot determine whether the Debtor received reasonably equivalent value in exchange for the transfer of its assets, because the Plaintiff did not clearly establish either (1)

the value of the assets transferred, or (2) the amount that the Debtor received in the transaction.

### A. The assets transferred

As shown above, the Assets and Liabilities Purchase Agreement provided for the transfer of "all of the assets" of the Debtor. (Plaintiff's Exhibit 10). Pursuant to the Agreement, the Debtor transferred all of its physical assets, and also its book of business. (Transcript, Vol. I, pp. 120–21).

Three expert witnesses furnished their opinion as to the value of the Debtor's agency at the time of the transfer.

First, Richard Russo (Russo), the Plaintiff's expert, testified that the agency was worth between $445,000.00 and $472,000.00 in April of 2001, based on a multiple of approximately one times the Debtor's annual revenue at the time of the sale. Russo's range of values does not include the value of the physical assets, which Russo estimated at $55,000.00, but contemplates payment of the purchase price over a period of approximately four to five years. (Transcript, Vol. I, pp. 267–70; Plaintiff's Exhibit 28).

Second, Andrew Beverly (Beverly), one of the Debtor's experts, testified that the agency was "of purely nominal value because of its portability." In other words, according to Beverly, a third-party buyer would pay very little for the Debtor's book of business because the Debtor did not have non-compete agreements with its producers, with the result that the producers could simply "walk away" with their business. (Transcript, Vol. I, pp. 224–25; Debtor's Exhibit 22). Also according to Beverly, the typical formula that is used to estimate an agency's value (based on a multiple of its annual gross revenue) does not apply to the Debtor because of the absence of such non-compete agreements. (Transcript, Vol. I, p. 234).

Third, John William Erb (Erb), the Debtor's second expert, testified that he would not provide an estimated "fair market value" for the Debtor's agency because five years had elapsed since the sale. (Transcript, Vol. II, p. 74). As to an "asset basis" valuation, Erb wrote in his report:

> ASSET VALUATION for the Book of Business and Tangibles is $607,060, less money due carriers or $476,823, assuming the employees and agents would sign Covenant Not to Compete or Solicit existing business. Due to the limited markets for Auto Dealership insurance and bond business, failure to pay the carriers and obtain Covenants from employees, would make Agency worthless.

(Debtor's Exhibit 22). At trial, Erb appeared to offer his opinion that the asset value of the Debtor's book of business as of April 2, 2001, was $476,823.00. (Transcript, Vol. II, pp. 81, 84–85).

The estimated value of the Debtor's agency as of the date of the transfer, therefore, ranges from zero to approximately $500,000.00, depending upon the particular factors emphasized in the valuation.

The expert testimony appears to establish that insurance agencies are normally valued based on a multiple of their annual revenues. In this case, however, the expert reports do not adequately explain the extent to which the general formula is affected by factors such as the Debtor's status as a niche agency, the absence of non-compete agreements between the Debtor and its producers, the ratio of the Debtor's expenses to its earnings, the fact that Debtor was "out of trust" with two of its carriers, and the pendency of a lawsuit against the Debtor.

Based on the evidence, therefore, the Court cannot specifically determine the

value of the Debtor's assets as of April 2, 2001, the date of the sale, and therefore cannot determine "what went out" as a result of the transfer.

### B. The value received

In deciding whether the Debtor received reasonably equivalent value in exchange for the transfer of its assets, the Court must also evaluate "what was received" by the Debtor in the transaction.

In this case, "what was received" by the Debtor was the buyer's promise to pay certain of the Debtor's debts. The liabilities assumed by DAS 2 in connection with the purchase of the Debtor's assets totaled the sum of $162,523.66, according to Exhibit B to the Assets and Liabilities Purchase Agreement. (Plaintiff's Exhibit 10).

The two largest obligations listed in the Agreement consist of a debt owed to North American Specialty Insurance in the amount of $50,599.40, and a debt owed to RLI Insurance Company in the amount of $45,826.20. The two obligations were based on premiums that the Debtor collected from its clients, but did not pay over to the carriers.

As discussed above, however, neither of the obligations was timely paid by DAS 2. Instead, North American Specialty Insurance subsequently filed a lawsuit against DAS 2 in the Circuit Court for Hillsborough County, Florida, and the parties entered into a Stipulation to Withhold Entry of Judgment in August of 2003. Pursuant to the Stipulation, DAS 2 agreed to pay the debt owed to NASI in accordance with a schedule set forth in the agreement. (Plaintiff's Exhibit 14).

Additionally, RLI Insurance Company subsequently filed an action in Larry O'Blander's bankruptcy case, and the parties entered into a Settlement Agreement in June of 2002. Pursuant to the Settlement, DAS 2 agreed to pay the debt owed to RLI over a period of twelve months. (Plaintiff's Exhibit 13).

Terry Clark, the president of DAS 2, was uncertain as to how much money had been paid to either NASI or RLI under the respective stipulations as of the date of the trial. (Transcript, Vol. I, pp. 129, 136–37).

In an effort to show that the Debtor received other consideration from DAS 2, therefore, the Debtor contended that other business debts had been assumed by DAS 2. The debts included vehicle leases, a loan from First Community Bank of Southwest Florida, and a loan from First Sierra Financial, Inc. The debts were originally owed either by the Debtor or by Larry O'Blander, individually. (Defendants' Exhibits 10, 11, and 12).

Although Larry O'Blander testified that the debts were assumed by DAS 2, however, the Debtor did not submit cancelled checks, satisfactions, or other clear evidence that DAS 2 has actually paid the obligations. (Transcript, Vol. II, pp. 122–124).

In short, the Court cannot determine the extent of the consideration actually received by the Debtor in connection with the sale of its assets. It appears that certain of the Debtor's obligations were assumed by DAS 2, and that at least a portion of the assumed liabilities may have been paid in the years following the transaction. The specific value received by the Debtor on account of the assumed liabilities, however, cannot be quantified based on the record before the Court.

### C. Conclusion

Since the record does not establish "what went out" or "what was received" by the Debtor in the purchase and sale, the Court cannot determine whether the Debt-

or received reasonably equivalent value in exchange for its assets. Consequently, the Court concludes that the Plaintiff has not satisfied its burden of proving that the transfer was constructively fraudulent under § 548(a)(1)(B) of the Bankruptcy Code or § 726.105(1)(b) of the Florida Statutes. *In re Ramsurat,* at 252.

### III. Preferential transfer

■ Count V of the Complaint is based on § 547 of the Bankruptcy Code. As applicable to this case, § 547(b) provided:

**11 USC § 547. Preferences**

. . .

(b) Except as provided in subsection (c) of this section, the trustee may avoid any transfer of an interest of the debtor in property—

(1) to or for the benefit of a creditor;

(2) for or on account of an antecedent debt owed by the debtor before such transfer was made;

(3) made while the debtor was insolvent;

(4) made—

(A) on or within 90 days before the date of the filing of the petition; or

(B) between ninety days and one year before the date of the filing of the petition, if such creditor at the time of such transfer was an insider; and

(5) that enables such creditor to receive more than such creditor would receive if—

(A) the case were a case under chapter 7 of this title;

(B) the transfer had not been made; and

(C) such creditor received payment of such debt to the extent provided by the provisions of this title.

11 U.S.C. § 547(b). To establish a cause of action under § 547(b), a plaintiff must establish that a transfer of the debtor's property was made, that the transfer was to or for the benefit of a creditor, and that the transfer was for or on account of antecedent debt. *In re Flooring America, Inc.,* 302 B.R. 394, 398 (Bankr.N.D.Ga. 2003).

■ In this case, the Plaintiff has not shown that the Debtor's assets were transferred to DAS 2 on account of an antecedent debt owed by the Debtor to the Defendants before the transfer was made. The transferee, DAS 2, was a new entity that had not been formed as of the date of the transfer. Further, the Plaintiff acknowledges that "if Counts I, II, III or IV are violated then probably Count V was not." (Transcript, Vol. II, p. 231).

The Plaintiff did not satisfy its burden of proving that the transfer constituted a voidable preference within the meaning of § 547(b) of the Bankruptcy Code.

### Conclusion

In this case, the Trustee seeks to avoid the transfer of the Debtor's assets to DAS 2 as a fraudulent transfer pursuant to § 548 of the Bankruptcy Code and § 726.105 of the Florida Statutes, or a preferential transfer pursuant to § 547 of the Bankruptcy Code.

The evidence established that the transfer was made to an insider, that the Debtor's sole owner receives benefits from the purchaser that are not commensurate with his services, that the transfer was not disclosed to the Debtor's creditors and the public, that the transfer occurred while a lawsuit was pending against the Debtor, that the transfer involved substantially all of the Debtor's assets and resulted in the Debtor's insolvency, and that the Debtor did not receive the consideration contemplated by the Purchase Agreement. Consequently, the Court finds that the transfer was made with the actual intent to

hinder, delay, or defraud the Debtor's creditors, and that the transfer to DAS 2 is therefore avoidable under § 548(a)(1)(A) of the Bankruptcy Code and § 726.105(1)(a) of the Florida Statutes.

Based on the evidence, however, the Court cannot determine whether the Debtor received reasonably equivalent value in exchange for the transfer of its assets. The Court concludes, therefore, that the Plaintiff did not satisfy his burden of proving constructive fraud under § 548(a)(1)(B) of the Bankruptcy Code or § 726.105(1)(b) of the Florida Statutes.

Further, the Trustee did not satisfy his burden of proof that the transfer constituted a voidable preference under § 547(b) of the Bankruptcy Code.

Finally, although the individual Defendants, Terry S. Clark and Ellen Deane, received salaries and other compensation from the transferee, DAS 2, for their services after the sale, the Plaintiff did not establish that the individual Defendants directly or indirectly received any of the Debtor's property in excess of their earned compensation.

Accordingly:

**IT IS ORDERED** that:

1. The transfer of the assets of the Debtor, Dealers Agency Services, Inc., to DAS 2, LLC, should be avoided as a fraudulent transfer pursuant to § 548(a)(1)(A) of the Bankruptcy Code and § 726.105(1)(a) of the Florida Statutes, and a Final Judgment avoiding the transfer should be entered in favor of the Plaintiff, Douglas N. Menchise, Trustee, and against the Defendant, DAS 2, LLC, as to Count I and Count III of the Trustee's Complaint.

2. In further respect to Count I and Count III of the Trustee's Complaint, however, Final Judgment should be entered in favor of the individual Defendants, Terry S. Clark and Ellen Deane, and against the Plaintiff, Douglas N. Menchise, Trustee.

3. The transfer of the Debtor's assets should not be avoided as a constructively fraudulent transfer pursuant to § 548(a)(1)(B) of the Bankruptcy Code or § 726.105(1)(b) of the Florida Statutes, and a Final Judgment should be entered in favor of the Defendants and against the Plaintiff as to Count II and Count IV of the Trustee's Complaint.

4. The transfer of the Debtor's assets should not be avoided as a preferential transfer pursuant to § 547(b) of the Bankruptcy Code, and a Final Judgment should be entered in favor of the Defendants and against the Plaintiff as to Count V of the Trustee's Complaint.

5. A separate Final Judgment will be entered consistent with this Opinion.